Fowler v. Wood.

GEORGE ANDERSON FOWLER *et al.* v. ANNIE B. WOOD *et al.*

No. 13,926.     (85 Pac. 763.)

SYLLABUS BY THE COURT.

1. STATE BOUNDARY—*Navigable River—Change of Position by Imperceptible Process.* If a navigable river dividing the territory of two states change its position by gradual and imperceptible encroachment or insensible recession, so that the process by which the removal is accomplished cannot be detected while in operation, the boundary follows the shifting thread of the stream.

2. NAVIGABLE RIVER—*Title to Bed, and Banks—Accretion.* In Kansas the title to the bed of a navigable river is vested in the state; private ownership in bordering land extends only to the river's margin, and if the position of the stream change in the manner described in paragraph 1 the boundary between the land of the state and that of other proprietors follows the movement of the river's edge.

3. ——— *Sudden Change of Course—Boundaries.* If while a river of the character described is at flood stage an ice-gorge cause a sudden and violent irruption of the water, whereby

the lands upon one side are visibly degraded or submerged, or a new channel is cut, the state boundary remains stationary at its former location, and the titles and boundaries of private owners remain unchanged.

4. ———— *Submerged Land—Reappearance—Reclamation.* If through the deposit of alluvion upon the former site, a deflection of the current of the river, or other action of the water, land submerged by avulsion be made to reappear, it may be reclaimed if its identity can be established.

5. ———— *New Formations—Accretion—Reliction.* New formations arising from the bed of a river belong to the owner of the bed, and new formations added to a bar or an island in the channel of a river by the process of accretion or reliction belong to the owner of the island or bar.

6. ———— *Change of Boundary—How Effected.* In order to effect a change of boundary, formations resulting from accretion or reliction must be made to the contiguous land, and must operate to produce an expansion of the shore-line outward from the tract to which they adhere.

7. ———— *Conveyance of Upland—Reappearance of Submerged Land.* If the owner of a body of land, a part of which has been submerged, convey the upland and retain title to the remainder, the purchaser, upon the reappearance of the submerged portion, can include it within his boundary only by the process of accretion or reliction.

8. ———— *Rights of Riparian Owners—Deflection of the Stream.* An owner of land bounded by a navigable stream has the right to protect his soil against inroads of the water, to secure accretions which form against his bank, and to erect and maintain improvements necessary to promote commerce, navigation, fishing and other uses of the river as navigable water; but he has no right, by obstructions placed across the main current, to deflect the stream itself into a new channel.

9. ———— *Deflection of Channel—Filling of Channel from Bottom—Boundaries.* If the channel of a river separating mainland belonging to one proprietor and an island, bar, restored land or other formation belonging to another proprietor be deflected and fill up so that the two bodies of land join, each owner is entitled to the accretions to and the relictions from his own shore. If the channel fill up from the bottom, without accretion to or reliction from either side, the boundary is the center of the channel as it was before the water left it.

10. ———— *Reappearance of Submerged Land after Partition—Rights of Owners.* After proceedings had been commenced to partition a body of land bounded upon two sides by navigable streams, and containing 250 acres, more or less, a portion of the tract was submerged by a violent flood. A survey was made before the water had subsided, and the partition commissioners reported. that owing to the waste by the washing away of the banks of the rivers the quantity of land had decreased to 200 acres. · Allotments were made proportional to that quantity, and ·the report was confirmed. The next year when the water went down a portion of the submerged land reappeared, and all of it, with accretions added, was subsequently restored. *Held,* that the owners are entitled to a partition of the undivided land with its accretions, on the equitable ground of a mistake as to the existence of a part of the subject-matter of the former suit.

11. ———— *Conveyance of Land—River Boundary—Presumption —Evidence.* If a private owner grant land, bounding it generally upon a river, the presumption that the grant will carry title as far as he owns is rebuttable, the question being purely one of intention; and when the intention is ascertainable from the record of a proceeding, or the face of an instrument, other evidence is inadmissible.

Error from Wyandotte district court; E. L. FISCHER, judge. Opinion filed May 12, 1906. Affirmed.

*Miller, Buchan .& Miller, C. F. Hutchings, S. D. Hutchings,* and *Thomas J. White,* for plaintiffs in error; *H. M. Meriwether, pro se.*

*Rossington, Smith & Histed, William B. Trembley, William L. Wood, J. O. Fife, Frank Hagerman,* and *Edward C. Wright,* for defendants in error.

The opinion of the court was delivered by

. BURCH, J.: The action in the district court was one of ejectment and partition. In 1857, pursuant to treaty stipulations with the Wyandotte Indians, the United States patented to Silas Armstrong a tract of land, irregular in shape, lying in the fork of the Missouri and Kansas rivers north of Turkey creek, and containing some 274.7 acres. The land was low bottom-land, of

33—73 KAN.

the peculiar formation which characterizes the valley of the Missouri river in this region, and subject to the vicissitudes which result from the conduct of that capricious stream. By purchase and descent various parties acquired undivided interests in this land. In some instances quantities in acres were conveyed, to be derived from the undivided holdings of the grantors. By the close of the year 1866 some twenty-five different parties claimed to be tenants in common of the tract, and on January 23, 1867, a suit was brought in the district court of Wyandotte county to partition it. The petition designated the land as "all that parcel of land lying in the fork of the Missouri and Kansas rivers and between the Missouri state line and the Kansas river as lies north of Turkey creek." The area was estimated at "about 250 acres, more or less."

On April 11, 1867, the court ordered that "for the purpose of ascertaining the quantity of land included in the boundaries mentioned in the petition of said plaintiffs a survey of the same be made, and it being represented that John Runk, jr., is a competent person to make said survey, he is hereby empowered to make the same and report by Saturday morning next." On April 13, 1867, a decree of partition was entered, which describes the land as it is described in the petition, and which closes by ordering a writ in due form to be issued to the sheriff of Wyandotte county, commanding him by the oath of three judicious and disinterested freeholders named to cause "the same said land" to be set off and partitioned among the parties found by the court to be entitled to portions thereof.

On September 26, 1867, the partition commissioners made their report. Those who were entitled to acre quantities were given shares out of the undivided interests of their grantors. In the description of various allotments boundary-lines are described as running "to the east bank of the Kansas river; thence down the same," etc.; and "to the west bank of the Missouri

river; thence down the same," etc.; and on the plat accompanying the report a number of lots are extended from river to river. The commissioners' report concludes with the following statements:

"By a survey which was made of the lands during the April term of the first district court, A. D. 1867, they were found to contain 208.4 acres, upon which a division was based. . . . A careful survey, made during the month of July last, shows that owing to the waste by the washing away of the banks of the Missouri and Kansas rivers the quantity of the land has decreased to 200 acres.

"The allotments are proportional to this in quantity, and give an area to Thomas Ewing, jr., of 18.63 acres; Calhoun heirs, 16.84 acres; Graham, 8.28 acres; Armstrong heirs, 34.58 acres; James, 54.42 acres; Wood, 20.94 acres; William Weer's heir, 25.13 acres; Swope, 9.06 acres; and the Union Pacific railway, E. D., 11.58 acres.

"The accompanying plat, hereto attached, represents the allotments, with the courses and distances marked on the lines, and the several areas in acres and hundredths of an acre."

The report of the commissioners was confirmed by the court on October 15, 1867, and no action having been taken to review the proceedings, they became final.

Subsequently to the partition suit the Missouri river continued to encroach upon those allotments of which it formed the boundary, and in order to prevent their lands from washing away the several owners entered into a contract with James F. Joy to deed him certain tracts bordering upon the stream, and extending back for quantity, in consideration of his riprapping the river-bank. The agreement is dated in August, 1868, and the work was completed within a few months following. Deeds were duly delivered to Joy whereby he acquired the entire Missouri River frontage from the mouth of the Kansas river to the state line, except that opposite the land of two of the allottees in the partition suit, Swope and Ewing, who paid for their proportion

of the work of riprapping in cash. The calls in the Joy deeds were to the bank of the Missouri river, and down and along the same. Later the title of these riparian owners passed either mediately or directly to the Armour Packing Company, the Hannibal & St. Joseph Railroad Company, the Fowler Land Association, the Metropolitan Water Company, and others.

From the time of the partition down to the time when the bank was protected a considerable quantity of land along the channel of the river was carried away by erosion. The final survey under which partition was made is known as the Miller survey, and the riprap bank, or Joy deed line, lay south of the north line of the Miller survey, at distances varying from 200 to 300 feet. The composite map following indicates crudely the position of the Missouri River bank at the time of the government survey, the Miller survey line, the riprap bank or Joy deed line, several of the allotments made by the commissioners in the partition suit, and affords some other information which may be useful in arriving at a comprehension of the case.

From 1868 until 1889 the deep-water channel of the Missouri river lay next to the riprap bank. Business enterprises requiring access to the river were established there. For a long time the Fowler Packing Company maintained a wharf upon its land (partition lot 16 and a segment of lot 15), from which steamboats loaded and discharged their cargoes, and all the commerce of the stream was carried upon the current which pressed against that bank. About the year 1889 the main current was diverted to the Missouri side of the stream. The old channel filled up, and at the commencement of this litigation the river was separated from the old riprap bank by a wide stretch of land many acres in extent.

This suit relates to land lying north of the Miller survey line and between that line and the river where it now runs. The plaintiffs are persons who have ob-

tained title by purchase or descent from the allottees in the partition suit other than those who were given acre quantities, and for all purposes of the case may be termed tenants in common of the Armstrong grant. The defendants may be designated as purchasers of those portions of the Armstrong grant which are shown by the report of the commissioners in the partition suit to border upon the Missouri river. With them are joined some of the cotenants of the plaintiffs.

The plaintiffs claim that, following unusual rains, the ice in the Missouri and Kansas rivers broke up early in the year 1867, after the partition proceedings were begun, and formed a gorge near the confluence of the streams. A stage of extraordinary high water followed, and the Missouri river with great rapidity and violence cut a new channel through the tract described in the partition suit. The June rise succeeded, and the water continued high throughout the year. The April survey in the partition proceedings disclosed that but 208 of the 250 acres of land remained, and by the next July eight acres of that had washed away. Consequently 200 acres, and no more, were partitioned, the allotments being made proportional to that quantity. Upon the subsidence of the flood in 1868 a portion of the Armstrong grant which had been submerged, and which had been cut off from the partitioned land by the new channel of the river, reappeared in the form of an island, upon both sides of which the water flowed, the great volume, however, passing through the channel and continuing to erode the bank until the Joy deed line was reached. The size of this island increased by accretions to it upon all sides. About the year 1889 some of the defendants placed obstructions out in the channel of the stream which, together with other artificial means, caused the main current to be deflected to the opposite shore. For some time the water lay in pools along the channel next to the riprap bank, but these at last disappeared and the island expanded to the mainland.

Fowler v. Wood.

The plaintiffs say they were not deprived of their land by the action of the river in the year 1867, or by the partition proceedings, or by any other means, and that all of such land with its accretions has been restored to them unpartitioned and in identifiable form.

The defendants dispute the facts furnishing the foundation of the plaintiffs' claim. They dispute some of the legal principles invoked in aid of such claim, and they deny the applicability of other principles essential to its support. Further than this, they assert that the plaintiffs are estopped from claiming that all the land of the Armstrong grant was not partitioned, and are estopped from denying that the partition allotments have followed the recession of their movable boundary —the river itself—to its present location.

Upon a trial by jury the plaintiffs and those defendants who are cotenants with them were awarded land indicated by the shaded portion of the map. The court rendered judgment upon the verdict, and reserved the matter of partition pending this proceeding in error. The jury returned answers to a large number of special questions covering practically all of the paramount facts. The special findings show that in 1856 the Armstrong grant contained 274.7 acres. When the partition suit was commenced it contained 250 acres, more or less. A new channel was cut through the land in controversy by the high waters of the Missouri river in 1867; the land in controversy was suddenly and perceptibly submerged by the violent rise of the river in that year; the ice-gorge of that year caused the river to cut a new channel and to wash away the bank; the cutting and the washing away of the bank between Kaw point (the point of land at the junction of the rivers) and the state line was not done in the usual manner of cutting along the banks of the Missouri river; the new channel varied from 200 to 300 feet in width, and after it was cut was the main channel of the river.

The jury further found that in 1865 or 1866 the Missouri river began to wash away the bank forming the border of the Armstrong grant, and in 1866 and 1867 the land caved into the river and washed away quite rapidly; but, as distinguished from this process, a portion of the land was cut off by the new channel of 1867 and left lying to the north of it in the form of an island. The land so cut off was from 100 to 200 feet wide and from 800 to 1000 feet long. It lay some 600 or 700 feet out, measuring from the line the river reached when the south bank was riprapped, and the south boundary of partition lot 18, if extended, would have about crossed its northwest point. No island was in existence between the mouth of the Kansas river and the state line when the partition suit was commenced. The one formed as described continued in existence at all times up to 1891 or 1892, when the water ceased to flow in the channel separating it from the mainland.

The findings also state that the high water continued during the entire season of 1867. During the flood the island referred to was entirely submerged. The top of it was scoured off and washed away. It did not reappear until the water had subsided the next year, and then it presented itself as a new formation of sand, or sand and soil, which afterward supported a growth of willows and weeds for some of the time. In later years it was frequently submerged, and its configuration changed somewhat, but it remained visible at all times in low stages of water. (In answer to one of the numerous and pertinacious special questions upon this subject the jury used the expression "very low water.")

The jury further found that a portion of the land in controversy was formed by accretions to the island. Prior to 1889 an accretion of sand, or sand and soil, formed in front of partition lot 18, about 100 feet wide at Kaw point. In that year what is known as the water-works dike was constructed in the river by one of the defendants, the Metropolitan Water Com-

pany, commencing 100 feet from the riprap bank. At the time the dike was built no deposits had begun to form in front of lots 12, 13, and 14. An accretion also formed in front of lots 15 and 16, but to the time of bringing suit it had extended only 250 feet (less than the width of the channel between the mainland and the island). After the dike was constructed the river ran around the end of the island in a southeasterly direction, in a channel lying north of it. The Ohio Avenue sewer, of Kansas City, Kan., was extended to this channel in 1889, but the river ceased to run there, and by 1892 it had entirely filled up, the river having receded beyond the government-survey line of 1856.

These findings are conclusive upon the facts to which they relate, and require consideration in the light of the legal doctrines of avulsion, submergence and reappearance, and accretion and reliction, to determine the rights of the parties to the action. The verdict being a general one, the evidence favorable to the plaintiffs and consistent with the special findings controls in all matters not covered by the findings themselves.

In the year 1867 the Missouri river formed the boundary between the state of Missouri and the state of Kansas at the place in question. The stream was navigable, constituted a public highway between the two states, and under the legal policy of each title to its bed was vested in them, the dividing line being the center of the main channel.

The courses of rivers being determined by the operation of the elements according to natural laws, they are subject to changes of location. If the change in the position of a navigable river dividing the territory of two states be by gradual and imperceptible encroachment, or insensible recession, so that the process cannot be detected while it is going on, the boundary follows the shifting thread of the stream. But if from storm or flood or other known violent natural cause there be a sudden, visible irruption of the water, whereby the

lands upon one side are degraded or submerged or a new channel is cut for the stream, the boundary remains stationary at its former location, and the boundaries of riparian owners whose lands have been affected remain unchanged. These principles are elementary in the law. The books teem with learning upon the subject, and the collation of authorities would be a work of supererogation. (*McBride v. Steinweden,* 72 Kan. 508, 83 Pac. 822.)

It is argued, however, that because of its crooked course, the velocity of its current, the friable character of its banks and the quicksand substratum of the adjacent soil it is characteristic of the Missouri river that large pieces of upland should suddenly, visibly and perceptibly break off, plunge into the water, and be swept away; and from this fact it is concluded that the law of avulsion cannot be applied to the conduct of this stream, or at least that it governs only in "ox-bow" cases like *Cooley v. Golden,* 117 Mo. 33, 23 S. W. 100, 21 L. R. A. 300, *Missouri v. Nebraska,* 196 U. S. 23, 25 Sup. Ct. 155, 49 L. Ed. 372, and *Nebraska v. Iowa,* 143 U. S. 359, 12 Sup. Ct. 396, 36 L. Ed. 186. If this river be distinguished from others by the violence and rapidity with which it invades the lands adjacent to its course, the findings of the jury are explicit upon the point that the Armstrong grant was not ravaged in the usual manner of cutting along its banks, and a clear distinction is made between the caving and washing away of marginal soil and the phenomena of this case. The ice-dam in the stream added an unusual and aggravating feature. Nothing short of the liberated energy of gorged water at flood-tide could have produced the tremendous results described in the testimony supporting the special findings. It is said that after the water gained headway it went through the land with a rush, tearing out the earth in massive blocks 5, 10, 20, 25 and 30 feet in width and sometimes 40, 50 and 300 feet long, felling forest-trees and otherwise devasta-

ting the tract, so that, upon an abatement of the inundation, in place of farm land a river channel 100 yards wide separated a denuded island from the shore.

The argument for the limitation of the avulsion doctrine was made in favor of the abolition of the law of accretion from the valley of the Missouri river in the cases of *Missouri v. Nebraska* and *Nebraska v. Iowa, supra.* The court held, however, that, notwithstanding the greater rapidity of changes here than elsewhere, the fundamental principles of the law were not affected.

In the case of *St. Louis v. Rutz,* 138 U. S. 226, 11 Sup. Ct. 337, 34 L. Ed. 941, the litigation arose out of circumstances much less extraordinary than those connected with the flood of 1867, but the rights of the parties were solved upon the theory of an avulsion. The facts were that the washing away of the banks of the Mississippi river opposite the city of St. Louis usually occurred at the time of the spring floods, which varied in duration but lasted from four to eight weeks. Each flood usually carried away a strip of land from off the river-bank 250 to 300 feet in width, the loss of which could be perceived in its progress. As much as a city block would be cut off and washed away in a day or two, and masses of earth from ten to fifteen feet in width frequently caved off, fell into the river and were washed away at one time. The court said:

"By findings of fact 6 to 9 the sudden and perceptible loss of land on the premises conveyed to the plaintiff, which was visible in its progress, did not deprive Blumenthal, as riparian proprietor, of his fee in the submerged land, nor in any manner change the boundaries of the surveys on the river front, as they existed in 1865, when the land commenced to be washed away.

"It is contended by the defendant, not only that the plaintiff never had any title to the bed of the river, but that, when the dry land of which he was in possession was swept away by the river and ceased to exist, his ownership of that land also ceased to exist. It is laid down, however, by all the authorities, that, if the bed

of the stream changes imperceptibly by the gradual washing away of the banks, the line of the land bordering upon it changes with it; but that, if the change is by reason of a freshet, and occurs suddenly, the line remains as it was originally. This principle is recognized by the supreme court of Illinois, in *Buttenuth v. St. Louis Bridge Company,* 123 Ill. 535, 546, 17 N. E. 439, 5 Am. St. Rep. 545, in these words: 'The law, as stated by law-writers, and in the adjudged cases, seems to be, that where a river is declared to be the boundary between states, although it may change imperceptibly, from natural causes, the river, as it runs, continues to be the boundary. But if the river should suddenly change its course, or desert the original channel, the rule of law is, the boundary remains in the middle of the deserted river-bed.' " (Page 245.)

In the case of *City of Chicago v. Ward,* 169 Ill. 392, 48 N. E. 927, 38 L. R. A. 849, 61 Am. St. Rep. 185, the testimony disclosed that the building of certain piers in the city of Chicago had the effect of throwing a strong current of the Chicago river against the shore of Lake Michigan, which gradually undermined the bank. Upon the occasion of storms the bank would fall, sometimes five, ten and thirty feet in width at a time, and sometimes as much as 100 feet would be washed away in a single storm. The court held that the boundaries of the land were not changed, quoting among other authorities Hargrave's Law Tracts, 36, 37, as follows:

" 'If a subject hath land adjoining the sea, and the violence of the sea swallow it up, but so that yet there be reasonable marks to continue the notice of it, or, though the marks be defaced, yet if by situation and extent of quantity and bounding upon the firm land the same can be known, though the sea leave this land again, or it be by art or industry regained, the subject does not lose his property; and accordingly it was held by Cooke and Foster, M. (7 Jac. C. B.), though the inundation continue forty years. . . . But if it be freely left again by the reflux and recess of the sea the owner may have his land as before, if he can make it out where and what it was, for he cannot lose his propriety of the soil, though it be for a time become part

of the sea and within the admiral jurisdiction while it so continues.'" (169 Ill. 407.)

The conclusion of the court was expressed thus:

"Under the authorities, and according to all reasonable deductions from legal principles, we must hold that the title to these lands submerged by the action of Lake Michigan was not lost, and that by their subsequent reclamation the city has completely reasserted its title thereto, as such title stood at the time of the dedication of the respective plats thereof." (Page 408.)

In volume 3 of Farnham on Waters and Water Rights, section 848, it is said:

"In case the river shifts its position so as to submerge land on one shore, the question is one of boundary. As seen in the preceding section, if the change in the river-channel is sudden, titles of the opposite proprietors are not changed, but if it is gradual and imperceptible, the middle thread of the river remains the boundary-line. . . . It will be remembered that the rule that the thread of the stream remains the boundary regardless of changes is based on the fact that the law presumes that the river does not change. This presumption should not be permitted to overcome an obvious and well-established fact. Therefore, if the change does not come within the definition of gradual and imperceptible, but the land is rapidly washed away on one side and formed on the other, the fiction should give way to the fact, and the owner should not lose title to his property. The title to the land itself is of more importance than the riparian right of access to the water or convenience of having a natural, rather than a mathematical, boundary; and rules which were made for convenience should not be permitted to wrest the title to land from its true owner."

These authorities are sufficient to show that the events of 1867 are clearly comprehended within the meaning of the term "avulsion," and it is not necessary that time be spent refining upon the words "gradual" and "imperceptible," or in framing new definitions to fit the varying facts of different cases.

They further show that it is not necessary that the river should be "annihilated" in its old bed and "reproduced in its new bed"—borrowing an expression from Vattel.

If the earth where Doctor Wood's house stood had not been swept away by the torrent, if his fences had not gone down the stream, if his corn-field had remained undisturbed, and that part of the Armstrong grant cut off by the new channel had not been stripped of its vegetation, there would be no contention now that a portion of the land had not been partitioned. The fact of its submergence and the formation of new land on the old site makes no difference in the rights of the parties.

"If the sea swallow land, if the bounds can be ascertained the owner may have them again if they are subsequently left to dry or are regained by him. And if the former extent of land can be known, it shall be returned to the owner." (Hale, De Jure Maris, ch. 4; 2 Rolle's Abr. 168.)

"When the denudation of the soil by the water is sudden and perceptible, the title is not changed. . . . If navigable waters, owned by the crown or state, suddenly encroach upon private lands adjoining, and there are marks by which their limits can be determined, the title to the soil thus covered remains in the former owner, and upon the recession of the water it is restored as his property. Though the overflow continues for forty years, yet if the water recedes the owner has his land again." (Gould, Waters, 3d ed., § 158.)

In volume 3 of Farnham on Waters and Water Rights, section 848, it is said:

"When the title to the bed of the water is in the public the sudden submergence of a parcel of land on the foreshore does not destroy the title of the private owner if within a reasonable time it can be reclaimed and the former boundaries established."

These texts are supported by the decisions of the courts, and undoubtedly express the true rule of law. The case of *Mulry v. Norton et al.*, 100 N. Y. 424, 3 N.

E. 581, 53 Am. Rep. 206, is a leading one upon this subject. The syllabus reads:

"Land lost by submergence may be regained by reliction, unless the submergence has been followed by such a lapse of time as precludes the identity of the land from being established.

"If, after a submergence, the water disappears from the land either by its gradual retirement or the elevation of the land by natural or artificial means, the proprietorship returns to the original owner.

"No lapse of time during which the submergence has continued bars the right of the owner to enter upon the land reclaimed and assert his proprietorship when the identity can be established by reasonable marks, or by situation, extent of quantity or boundary on the firm land.

"And so if an island forms upon the land submerged, it belongs to the original owner."

In the opinion it was said:

"It is not, however, every disappearance of land by erosion or submergence that destroys the title of the true owner, or enables another to acquire it, for the erosion must be accompanied by a transportation of the land beyond the owner's boundary to effect that result, or the submergence followed by such a lapse of time as will preclude the identity of the property from being established upon its reliction. Land lost by submergence may be regained by reliction, and its disappearance by erosion may be returned by accretion, upon which the ownership temporarily lost will be regained. . . . A case quite in point is referred to by the respondent's counsel as arising in Delaware in 1815, decided by the court of common pleas upon a learned opinion by Judge Wilson, a copy of which is attached to the plaintiff's brief. The case does not seem to be elsewhere reported. It arose over the ownership of an island called 'Wilson's Bar,' which had been created by alluvion upon land formerly contained within the boundaries of an island called Little Tinnicum, but which at some time had been worn away by the ocean. The court say: 'The right to the new island and also to land gained by alluvion or dereliction, all of which are governed by the same principle, follows the right to the soil which is covered by the water. Though the surface of the lower part of Little Tinnicum was de-

stroyed by the force of the winds and the waves, and it was consequently overflowed by the water of the river, yet the owner did not lose the propriety of the remaining land covered by the water if it was regained either by natural or artificial means, it continued to belong to the original proprietor.' 'The earth deposited on it became his by the right of alluvion, and of course this island formed on it by such deposit became his. And though it probably has extended beyond the limits of the old island, the addition is plainly alluvion.' " (Pages 434, 435.)

The Delaware decision referred to (*Morris v. Brooke,* Del. Com. Pl., July, 1815) has been printed in volume 53 of the American Reports, at page 215.

In the recent case of *Hughes et al. v. Heirs of Birney et al.,* 107 La. Ann. 664, 32 South. 30, the principle under consideration was applied to land uncovered by the recession of the waters of "Lake Centennial" from a portion of De Soto point, opposite Vicksburg. The so-called lake was an enlargement of the Mississippi river which was formed by a cut made through the tongue of land in 1876. The water was drawn off, and the lake gradually filled up, by the river making another cut to a point further down the stream in 1898. The opinion was based on the standard authorities, and the syllabus reads:

"If, after submergence, the water disappears from the land, either by gradual retirement, or by the elevation of the land by natural or artificial means, and its identity can be established by reasonable marks, or by situation, extent, quantity, or boundary-lines, the proprietorship returns to the original owner."

In the case of *St. Louis v. Rutz,* 138 U. S. 226, 11 Sup. Ct. 337, 34 L. Ed. 941, it was said:

"It is laid down by all the authorities that, if an island or dry land forms upon that part of the bed of a river which is owned in fee by the riparian proprietor, the same is the property of such riparian proprietor. He retains the title to the land previously owned by him with the new deposits thereon." (Page 245.)

Fowler v. Wood.

The same rule applies to titles held by the United States.

"Island No. 42 in the Missouri river, within the present state of Missouri, was surveyed by the United States in 1820, and then contained about fifty acres. Subsequently during floods it was submerged, and a portion of the surface was washed away; but on the subsidence of the waters a portion of it reappeared, and at no time was it washed away to the level of the bed of the river, a channel remaining between the island and the west bank of the river. About 1880 the river cut a new channel, commencing above the island, and returning to the old channel below it, making a curve to the eastward, which enclosed about 1100 acres, and leaving the old channel and the island dry. Thereafter plaintiff entered the island as public land, and received a patent therefor according to the original survey. Under the law of Missouri the title of riparian owners on a navigable stream extends only to the water-line. *Held*, that the title of the United States to the island was not lost by the erosion or submergence, and that, by 'its conveyance after it reappeared on the reliction of the waters, plaintiff took title thereto with the additions made by alluvion and accretion." (*Widdicombe v. Rosemiller*, 118 Fed. 295, syllabus.)

It is suggested that the right to reclaim submerged land can be asserted only when the riparian proprietor owns to the thread of the stream, but no reason is offered in support of the suggestion, and none is apparent. If through some catastrophe the river make its bed upon private land the burden should fall as lightly upon the private owner as possible. It is sufficient for the state that control be retained over the stream for the preservation of its public highway character. More than this the state ought not to take. Whatever the riparian owner lost should not be withheld when the water recedes and the need of public supervision is at an end. Whether originally he had or had not some land already under water cannot affect his rights. The land when restored is his own because avulsion affects neither boundaries nor titles. Proprie-

34—73 KAN.

torship is not lost in the portion covered, and when it rises to the surface, whether by the deposit of alluvion or a change in the channel of the river, dominion reattaches as if it had never been suspended; and whatever accretions may have been added to the tract belong to its proprietor, as in ordinary cases. By a failure to discriminate between the effects of avulsion and ordinary erosion counsel for defendants have been led into an error respecting the prevalence of the doctrine of submergence and reappearance in the region through which the Missouri river flows. Nowhere has it been repudiated where the facts have required its application.

Such being the law and the facts, the avulsion of 1867 did not disturb the boundary between the state of Missouri and the state of Kansas, and the boundaries of the Armstrong grant as they existed when the partition suit was commenced were not changed. The land under the new channel of the river, the island and the shoals beyond the island still belonged to those who owned the soil before the flood. This land has been identifiable from the time the high water subsided, and the limits of the entire tract as they were known in 1867 have been proved in this action. The owners are entitled to reclaim it, and to have it partitioned, unless they have lost title to it in some manner or are debarred from asserting their rights upon some ground suggested by the defendants.

It is of course idle to assert that the partition proceedings conclusively prove the fact to be that the proprietors of the Armstrong grant had no more land in July, 1867, than the 200 acres which were divided. There is fair ground to argue that the allottees are estopped to claim title to more, but the physical existence of a portion of the earth's surface cannot be annihilated by writing up a court record to that effect. It is plain that the surveyor measured a tract of land surrounded by three streams, two of them at least at

flood stage, and found 200 acres of land out of water. The partition commissioners believed that the two rivers had permanently appropriated the remainder of the tract described in the petition, and in effect so reported. The retirement of the waters of the Missouri river and the restoration to its owners of a large body of land not included in the report were not contemplated. The court and the parties acted upon the circumstances as they then appeared, and closed the case before the river went down. Ordinary sagacity is to be imputed to them. They were mistaken, and the report, false in fact because based upon conditions erroneously believed to be perpetual, does not stand in the way of the truth.

It is the law that courts will not allow one cotenant to vex those having estates in common with him with a multiplicity of suits for partition, and ordinarily all the joint property must be included in one suit. But if they own two tracts they may voluntarily divide one of them, or they may ask the court to divide one of them, without depriving themselves of the right or the court of jurisdiction subsequently to apportion the other. Nor will relief be denied them if acting in good faith they should overlook a tract.

"It is true that a petition for a partition of a part of an estate held by tenants in common will not be entertained against the objection of any person interested. Ordinarily, a petition of this kind should include the entire estate held in common; but it does not follow, if by mistake, or by the consent of all the tenants, a partition has been made of a portion of their estate, whether by order of the court or otherwise, that the court is powerless to divide the remainder on a petition of one or more of the tenants in common. It would be a harsh rule that, after a division of a part of an estate, partition of the remainder could never be ordered by the court. When parties have acted innocently and fairly in making or obtaining a division which does not cover all their estate, there is no reason why the law should not aid them when they ask for a division of the remainder." (*Barnes v. Boardman,* 157 Mass. 479, 480, 32 N. E. 670.)

(See, also, *Adams v. Hopkins,* 144 Cal. 19, 77 Pac. 712; *Richardson v. Ruddy,* 10 Idaho, 151, 77 Pac. 972.)

Likewise, if parties have acted innocently and fairly, and a portion of the estate described in the petition and ordered to, be partitioned has been omitted from the report of the commissioners under a mistake as to the facts, there is no reason why, upon discovery of the true state of affairs, they should not have the right to bring suit in equity to enforce the decree as to the remainder as the exigencies of the case and the interests of the parties require (*Bank v. Kingman,* 62 Kan. 571, 64 Pac. 65, and authorities there cited; *Wadhams et al. v. Gay,* 73 Ill. 415), or else be permitted to avail themselves of the more direct remedy of an ordinary suit for partition of the omitted part, in which the equitable right to relief may, under the practice in this state, be fully investigated. The enforcement of any other rule would breed deserved contempt for the formalism of the law, and prove it to be a tyrant over the fortunes of men rather than a servant in the accomplishment of their just and blameless desires. Conceding to the partition proceedings that for which the defendants argue—the effect of mutual deeds—still if parties are mistaken as to the quantity of land they actually own, and the disparity is great enough to challenge the attention of a court of conscience, relief may be granted.

"Where plaintiff and his two cotenants attempted to partition their land under a mutual mistake that it only consisted of seventeen acres, when in fact they owned fifty-two acres, and one of them refused to execute deeds, and thereafter defendant purchased the land except plaintiff's interest, claiming ownership of the entire fifty-two acres except the five and two-thirds acres first deeded to plaintiff, there was such disparity between the quantity of land believed by all the parties to exist and that which they actually owned that plaintiff was entitled to relief on the ground of mutual mistake, and hence a judgment in partition awarding plaintiff an equal one-third of the remainder of the land was proper." (*Cartmell v. Chambers,* 54 S. W. [Tex. Civ. App.] 362, syllabus.)

Fowler v. Wood.

The principle upon which this decision is based is fundamental in the law of contracts.

"In cases of mutual mistake going to the essence of the contract it is by no means necessary that there should be any presumption of fraud. On the contrary equity will often relieve, however innocent the parties may be. Thus if one person should sell a messuage to another, which was at the time swept away by a flood or destroyed by an earthquake without any knowledge of the fact by either party, a court of equity would relieve the purchaser upon the ground that both parties intended the purchase and sale of a subsisting thing, and implied its existence as the basis of their contract." (1 Story's Eq. Juris., 13th ed., § 142.)

The same principle should govern if the conditions were reversed and the parties innocently but erroneously believed the messuage had washed away. The head-notes to the report of the case of *Ross v. Armstrong*, 25 Tex. (Supp.) 354, in volume 78 of the American Decisions, page 574, give the gist of the decision as follows:

"Under joint adventure between holder of head-right certificate and locator to secure patent to government land, and to divide the land when acquired, if, after securing the grant and dividing the land, it is discovered that part of the land which the government has thus granted had been previously appropriated by older title, the partition is one upon a mistake of facts from which equity will relieve.

"It is a general rule in equity that an act done or contract made under mistake or ignorance of material fact is voidable and relievable against in equity, when such mistake or ignorance constitutes a material ingredient in the contract, or the motive of the act done by the parties, and disappoints their intention by a mutual error."

The obligation to abide a judgment and refrain from a second suit is affected by the same considerations:

"There is no doubt respecting the general correctness of the proposition expressed in the maxim, '*nemo debet bis vexari pro una et eadem causa.*'

"This rule, however, is not of universal application.

The origin and object of the rule were the prevention. of the vexations incident to a multiplicity of suits, which the law, equally as much as equity, abhors.

"The principle above asserted finds more familiar expression in the statement that a party shall not split his cause of action.

"Now, it is quite obvious, that such prohibition *presupposes knowledge* of the constituent elements of the cause of action sought to be unwarrantably divided. If this be true, and it be true also that the law does not require what is impossible, then it must needs follow, that a party should not be precluded in consequence of a former action, if such action were brought in unavoidable ignorance of the full extent of the wrongs received or injuries done. Any other conclusion would be reached only through sanctioning the rankest injustice.

"In *Farrington v. Payne*, 15 Johns. 432, the question is asked: 'Suppose a trespass, or a conversion of a thousand barrels of flour, would it not be outrageous to allow a separate action for each barrel?' Undoubtedly it would. But in such a case, where the owner is ignorant of the extent of his loss, would it not be far more outrageous to allow a recovery of *one* barrel, to prevent the recovery of the remaining nine hundred and ninety-nine?

"This question will meet with an affirmative response in every honest heart." (*Moran v. Plankinton et al.*, 64 Mo. 337, 338.)

(See, also, *Alexander v. Bridgford*, 59 Ark. 195, 27 S. W. 69; *Gedney v. Gedney*, 160 N. Y. 471, 55 N. E. 1.)

A mistake in a division line in a decree of partition originating in the report of the referees which was confirmed without objection will be corrected in equity. (*Smith v. Butler*, 11 Ore. 46, 4 Pac. 517.) Equity will likewise take jurisdiction to correct a decree of foreclosure from which a lot has been omitted by mistake. (*Snyder v. Ives*, 42 Iowa, 157.) And the fact that the cause in which a mistake occurs has been taken to the supreme court and the judgment affirmed will not defeat the exercise of such power. (*Partridge & Co. v. Harrow and Harrow*, 27 Iowa, 96, 99 Am. Dec. 643.)

It is true that the partition proceedings are conclu-

sive in reference to the nature and extent of the titles of the respective parties. The decree that they are tenants in common cannot be impeached to show that one or more of them owned in severalty. Nor can any of them take advantage of a second proceeding to make a claim for compensation for improvements which should have been asserted in the first instance. (*Forder v. Davis,* 38 Mo. 107; *Bobb v. Graham,* 89 Mo. 200, 1 S. W. 90; *Spitts v. Wells,* 18 Mo. 468; *Burger v. Beste,* 98 Mich. 156, 57 N. W. 99; *Cane v. The Rock River Canal Company,* 15 Wis. 179; *Janes v. Brown,* 48 Iowa, 568.) So, if the commissioners had established a right of way to some of the allotments another could not now be claimed, and if a strip of land had been left undivided for the purpose of furnishing to some of the allottees free access to their premises the fact could not now be disputed. (*Carey v. Rae,* 58 Cal. 159; *Miller v. The City of Indianapolis et al.,* 123 Ind. 196, 24 N. E. 228; *Turpin et al. v. Dennis,* 139 Ill. 274, 28 N. E. 1065.)

In the case of *Miller v. The City of Indianapolis et al., supra,* it was said:

"In their report to the court the commissioners reported that they had divided the land intended for partition into lots, blocks, streets, and alleys, and in their report of partition they informed the court that they had assigned to each of the parties interested in said land his or her share in the same in severalty. No person examining these proceedings would be led to believe that any portion of the land described therein was left undivided, but, on the contrary, when examining the plat in connection with the report of the commissioners in partition, and the judgment of the court thereon, would be led to the belief that the strip in controversy was intended as a sixty-foot street, furnishing an outlet for the blocks abutting thereon. . . . The property adjoining this strip has passed into the hands of third parties. . . . To permit the appellant to say now that this strip was left by the commissioners as undivided land, and was not intended as a street, would be obviously unjust to those who purchased the property on the faith of the plat

and the partition proceeding. We do not think the court erred in refusing to admit this offered testimony." (Pages 206, 207.)

None of these cases, however, which are referred to because cited by counsel for defendants, reaches to the marrow of this controversy, which relates not to what the commissioners' report includes but to what it disregarded. The report shows that 200 acres, and no more, of the land described in the petition were partitioned. A flood prevented the division of the remainder. The commissioners led the court and the parties to believe that the omitted territory had washed away. It was under water at the time, and remained so until the next year. The parties were not at fault in relying upon the statement of the commissioners as true. They were all, however, mistaken. The mistake involved the existence of a large portion of the subject-matter of the suit. Belief in its non-existence led them to take no further account of it. Therefore, under the ancient and well-established principles of equity jurisprudence, the plaintiffs are entitled to relief unless the defendants will be deprived of some right to the land; and under the liberal rules of procedure prevailing in this state the question may be determined in an action for the possession and partition of the tract excluded from the former report.

The defendants cite the leading authorities to the effect that when a private individual grants property belonging to him, and bounds it generally upon a stream, the presumption is he does not intend to reserve any land between the upland and the stream, and if his property extend beyond the water-line the presumption is the grant will carry title as far as he owns. The subject is discussed in volume 3 of Farnham on Waters and Water Rights, section 852. As stated by the author just referred to (section 855), the presumption ordinarily indulged is rebuttable, the question being purely one of intention. When the intention is ascertainable from the face of an instru-

ment or a record, other evidence is not admissible, and under the well-understood rule the court must make the interpretation and not the jury.

The full intention of the court and the parties to the partition proceeding is clearly expressed. No land whatever north of the Miller survey line was partitioned or conveyed, for the stated reason that none remained. It had washed away. The meaning is as clear as if the line had been established at a granite escarpment instead of a navigable river. In the theory of the law one form of earth sculpture is as enduring as another. The bank of a river is a monument the same as the face of a cliff. The presumption is that it does not change, and dominion may be limited as conclusively by a river-bank as by any other natural object. The allotments were intentionally made proportional to a residue of 200 acres, and the proposition that the design was that the six allottees whose proportional shares touched the river should, because of that fact, receive some fifty acres more of unpartitioned common land is not worthy of discussion. No land was reserved between the partitioned land and the river. Lot 18 was first conveyed by a description limited as follows:

"As set apart to the Union Pacific Railway Company, Eastern Division, by the judgment and decree of court in the case of Thomas Ewing, jr., et al., v. William Weer et al., at the April term, 1867, of the first judicial district in and for the county of Wyandotte, Kansas, numbered on the appearance docket of said court 911, as remains of record and on plat in cause numbered 18."

Lot 16 was first conveyed as "the same land designated as lot 16, as shown on the plat in case No. 911, Thomas Ewing, jr., et al., v. William Weer et al., in the first judicial district court, Wyandotte county, Kansas, and set apart to said Swope in said suit, the papers and records in which case are here referred to for description of said lot 16." Lot 15 was first conveyed

by deeds which limited the grant to a part of lot 15 in the plat in the partition suit of Thomas Ewing, jr., et al., v. William Weer et al., such plat being on file in the clerk's office of the first judicial district of Kansas, in Wyandotte county. A further reference in these deeds to a plat of the city across the Kansas river, which by its own outlines and by the certificates of the surveyor and the dedicating party excludes this land, added no certainty to the specific description already given; and to say that the decorative sketch upon this plat—no doubt satisfactory to the artistic taste of the draftsman—was seized upon by the grantor as the indisputable mark by which he could evince a determination to give to James F. Joy land which Joy was trying to keep covered by the water of a navigable river involves a flight of fancy which the court hesitates to attempt. Other primary conveyances of partition allotments are equally conclusive. No purpose to deed undivided interests in other land owned by numerous tenants in common can be interpolated.

Some of the defendants make no point that their deeds carried with them title to undescribed land by implication, and the position of the others is quite inconsistent with the very substantial and meritorious claim that they were purchasers of tracts bordering upon a navigable river whose bed belonged to the state, and hence that they took title only to its margin. (Wood v. Fowler, 26 Kan. 682, 40 Am. Rep. 330; Peuker v. Canter, 62 Kan. 363, 63 Pac. 617.)

It is entirely clear that several of the defendants made their purchases from a desire to secure a location upon the main navigable channel of the Missouri river. Believing they had secured a permanent frontage of that character, they have expended fortunes in the improvement of their estates. To be cut off from the river is an incalculable hardship, and the plaintiffs will not be allowed to interfere in any wrongful way

with the riparian rights of the defendants. What, then, are the riparian rights of the defendants? Manifestly those of access to the stream, accretions to their shores, and land left by the reliction of the water from such shores.

From the findings of the jury it fairly appears that the building of the water-works dike deflected the main channel of the Missouri river from the land of the defendants, and that none of their land protruded northward, either by accretion to it or by the recession of the water from it, beyond the line of the Miller survey. The little that is lacking in the findings is abundantly supplied by the evidence given in connection with that upon which the findings are based. It is to the effect that the water company drove a double row of piling across the main channel of the river flowing between the island and the riprap bank, obstructing the current and diverting it to the north side of the island. Sand and sediment settled below the dike and formed a bar across the channel, which then commenced to fill up. Because the current had always scoured the riprap bank the progress of accretion while the channel was filling was from the island toward that bank, until a slough, and then pools of water next to that bank, were all that remained of the stream. After the water-works dike was constructed the city sewer was extended to reach flowing water. Later the harbor line was established at the end of the dike, to which an addition had meantime been made; considerable reclamation work and dumping of material into the stream helped to clog it, but much of plaintiffs' land was uncovered by the initial work of diversion.

It is useless to discuss the irreconcilable conflicts in the testimony bearing upon these important questions. They have been settled by the findings and verdict of the jury adversely to the defendants. All the evidence in the 3000 pages of the record favorable

to the plaintiffs is brought to the aid of the findings and the verdict. It is abundant to support every claim the plaintiffs make, and the court is now concerned with nothing but the rules of law governing the case.

If the title to the bed of the river had been in the state, and had not remained in the plaintiffs because of the avulsion of 1867, the piling in question would have constituted a purpresture, abatable by a suit in equity at the instance of the state. (*Revell v. The People,* 177 Ill. 468, 52 N. E. 1052, 43 L. R. A. 790, 69 Am. St. Rep. 257.) As it is, it was an obstruction to navigation and a public nuisance. Besides this the deflection of the river by means of it invaded the private right of every individual entitled to the flow of the water past his land. The water company had the right to protect its land against inroads of the stream; it had the right to secure the 100 feet of accretion to its land; and it had the right to erect all improvements necessary to secure and promote commerce, navigation, fishing, and other uses of the stream as navigable water. But it could not destroy the stream itself. All the courts agree that even wharves, which are indispensable to navigation, cannot be extended beyond the line of navigability and will not be endured if they constitute a nuisance in fact. (*City of Madison v. Mayers and others,* 97 Wis. 399, 73 N. W. 43, 40 L. R. A. 635, and note, p. 642, 65 Am. St. Rep. 127.)

The claim of the water company, stripped of all sophistry, reduces to the demand that it may remove the stream from its channel to some remote locality and then appropriate the plaintiffs' land in order to obtain access to the water; and the claim of the other defendants, similarly denuded, is that because the water company has preyed upon them they are licensed to prey upon the plaintiffs. Manifestly such is not the law. The syllabus of *Halsey v. McCormick,* 18 N. Y. 147, reads:

"Where the water is diverted by artificial means,

and not imperceptibly, from the land of a proprietor bounded by low-water mark, he acquires no title to the derelict bed of the stream."

In the opinion it was said:

"McCormick deepened the bed of the stream on the south side, and placed stones along the center so as to confine the water in the channel thus deepened, and by this means the land in question was left bare. He may have been guilty, by these acts, of a violation of the riparian rights of the plaintiff or his grantors, but I know of no rule of law which would constitute an illegal act of the kind a transfer of the title." (Page 149.)

In *Lewis v. Lumber Company,* 113 N. C. 55, 18 S. E. 52, the area of an island in a swamp had been enlarged. by drainage. It was said:

"Such enlargement of the original island by artificial means was not an accretion that inured to the plaintiff's benefit, and, if not, it was competent as in all such cases to show the original low-water line as defining the limits of the island when granted. Tiedeman, § 685 *et seq.;* Malone, Real Prop. 253." (Page 61.)

In volume 1 of the third edition of Wood on Nuisances, section 494, the text reads:

"Every proprietor of land exposed to the inroads of the sea may erect on his own land groins, or other reasonable defenses, for the protection of his land from the inroads of the sea. . . . But a man has no right to do more than is necessary for his defense, and to make improvements at the expense of his neighbor."

In the cases of *Tatum v. City of St. Louis,* 125 Mo. 647, 28 S. W. 1002, and *Whyte v.-St. Louis,* 153 Mo. 80, 54 S. W. 478, the trustee of a riparian owner, and later the assignee of the rights of such owner, sought to recover from the city itself accretions formed by the acts of the city and by a railroad company over which the plaintiff had no control, and declarations of law in favor of the plaintiff were made. In the case of *Steers v. City of Brooklyn,* 101 N. Y. 51, 4 N. E. 7, a wrongful structure was given to

the riparian owner, in front of whose land it had been. erected, as an accretion. The court said:

"The wrong-doer should gain nothing by his wrong, and justice cannot be done to the upland owner except by awarding to him, as against the wrong-doer, the accretion attached to his soil as an extension thereof. (*Ledyard v. Ten Eyck,* 36 Barb. 102, 125; *Langdon v. Mayor, etc.,* 93 N. Y. 129; *Mulry v. Norton,* 100 N. Y. 424, 3 N. E. 581; Gould, Waters, §§ 123, 124, 128, 148, 158; Angell, Tide-waters, 249.)"

It is equally clear that the defendants other than the water company cannot keep for their own use accretions to plaintiffs' land. Peter may not be plundered to recompense Paul. Especially is this true since the other defendants had a right to redress against the water company. In the case of *Fulmer v. Williams,* 122 Pa. St. 191, 15 Atl. 726, 1 L. R. A. 603, 9 Am. St. Rep. 88, a riparian owner filled up the channel of a river running between an island and the land of an opposite proprietor. The party wronged was awarded damages for the injury special to himself, the court holding the maxim, *sic utere tuo ut alienum non lædas,* to be clearly applicable. Upon a subsequent appeal of the same case the court said:

"The diversion of the stream was an injury to his land that was direct, peculiar, and not shared with the general public. It was as clearly actionable as the diversion of a stream passing over his land. Whoever brought about such diversion so as to deprive him of the advantages of his location, whatever they were, inflicted a pecuniary wrong upon him. The manner in which the diversion is brought about is not important. It might be accomplished by means of elaborate works arranged to carry the stream elsewhere, or it might be effected by filling up the channel so as to compel it to seek another. The result accomplished and the injury inflicted would be the same. The lower riparian owner would be deprived of the natural advantages which ownership of the land at that point gave him, by the unlawful act of another; and he would have a right to call upon the wrong-doer to repair the wrong done him by restoring the stream to its channel or making com-

pensation for its loss." (*Williams* [*Appellant*] *v. Fulmer, Appellant,* 151 Pa. St. 405, 414, 25 Atl. 103, 31 Am. St. Rep. 767.)

In the case of *City of Georgetown v. The Alexandria Canal Company, &c.,* 37 U. S. 91, 9 L. Ed. 1012, the syllabus reads:

"The Potomac river is a navigable stream, or part of the *jus publicum;* and any obstruction to its navigation would, upon the most established principles, be a *public nuisance.* A public nuisance being the subject of criminal jurisdiction, the ordinary and regular proceeding at law is by indictment or information, by which the nuisance may be abated, and the person who caused it may be punished. A court of equity may take jurisdiction in cases of public nuisance, by an information filed by the attorney-general. If any particular individual shall have sustained special damage from the erection of it, he may maintain a private action for such special damage; because, to that extent, he has suffered beyond his portion of injury, in common with the community at large."

Citations of authority to the same effect might be multiplied. Therefore the fact that the navigable channel of the river has been diverted from alongside the defendants' land by the means described gives them no right to appropriate the plaintiffs' premises in order to preserve their riparian privileges. They must acquire title to the coveted tract in some manner recognized by law.

Upon their own theory of the case, the defendants' purchases being bounded upon a navigable river, they took no title beyond the bank, the bed of the river belonging to the state. If so they could obtain title to no part of the bed of the stream, nor to any land formations upon the bed of the stream, except by grant, which they did not receive, or by the processes of accretion and reliction. It is a matter of no concern to the defendants who may own that which is not theirs; and since the title of the plaintiffs was not taken away by the catastrophe of 1867 the defendants are limited

to precisely the same methods of acquisition as if the bed of the river belonged to the state.

Accretions must consist of deposits formed against, and added to, the bank. In Lord Hale's treatise, "De Jure Maris et Brachiorum Ejusdem," it is said:

"Let us now come to the *maritima incrementa,* viz.: *Alluvio maris; recessus maris; et insula maris.*

"(1) For the *jus alluvionis,* which is in an increase of the land adjoining by the projection of the sea casting up and adding sand and slubb to the adjoining land, whereby it is increased, and for the most part by insensible degrees."

Chapters 5 and 6 of this valuable tract, from which the quotation is made, are reprinted in volume 16 of the American Reports, at page 54 *et seq.* The definition of Mr. Justice Gantt, given in *Lammers v. Nissen,* 4 Neb. 245, notes this characteristic:

"An accretion to land is the imperceptible increase thereto on the bank of a river by alluvion, occasioned by the washing up of sand or earth, or by dereliction as when the river shrinks back below the usual watermark; and land so formed by addition belongs to the owner of the land immediately behind it." (Syllabus.)

In the case of *Wallace v. Driver,* 61 Ark. 429, 33 S. W. 641, 31 L. R. A. 317, it was said:

"According to the cases we have cited, the highwater mark, as thus defined, being the boundary-line of the riparian owner in this state, is the point at which the formation of all lands acquired by him by accretion must begin. A formation of alluvion beginning at any other point would belong to the state or other party." (Page 435.)

In the case of *Holman v. Hodges,* 112 Iowa, 714, 84 N. W. 950, 58 L. R. A. 673, 84 Am. St. Rep. 367, a bar formed on the bed of the Missouri river, which increased in size until it became fit for agriculture and finally joined the shore. The opinion reads:

"Without setting out the evidence in detail, it is enough to say that the formation of the bar or island has been entirely distinct from any accretion to the

shore.  It arose near the middle of the river, though probably east of the thread of the then main current, without any connection with the Iowa shore, and was gradually added to by accretion or reliction until an island of the proportions mentioned was formed.  Not only is this true, but the conclusion seems inevitable from the circumstance shown that the additions to plaintiffs' land, whether from accretion thereto or the receding of the waters, have resulted from the formation of the island.  Its existence undoubtedly changed the main current of the river, and by its growth to the northeast gradually cut off the stream formerly flowing between it and the shore.  Whether this be true, however, need not now be determined.  It is enough for the purposes of this case that the land beyond the channel last mentioned was formed independently of plaintiffs' land.  It then never became part of their lots through the process of accretion or reliction.  . . .  It is said that, even though it [the state] may have owned the island when surrounded by water, that title moved from beneath it as the river receded, and the land became plaintiffs' as soon as connected with shore.  It is conceded that no authorities have been found announcing such a doctrine, and we have been unable to discover any case awarding a riparian owner land because connected to his own, save when this has occurred through the imperceptible accretion or the reliction thereof by the gradual receding of the waters."  (Pages 715, 716.)

In the case of *Linthicum v. Coan,* 64 Md. 439, 2 Atl. 826, 54 Am. Rep. 775, it was said:

"If the land in question was formed by gradual accessions extending from the shore into the river, it would belong to the riparian proprietor; and this would be the case notwithstanding the fact that by the influence of floods and freshets large deposits of mud may have been made in the bed of the river.  These deposits would, of course, materially contribute to the formation of land, and would hasten the time when it would appear above the surface of the water.  But the leading characteristic of alluvion is the gradual extension of the land from the shore into the water; and when this is the case, it is irrelevant to consider the causes which, operating beneath the surface of the stream, have brought about the result.  On the other

hand, if land was formed in the river, and extended inwards toward the shore, it would be the property of the plaintiff, with all its accretions." (Page 454.)

The decisions in *Posey v. James*, 7 Lea (Tenn.) 98, and *Hammond v. Shepard*, 186 Ill. 235, 57 N. E. 867, 78 Am. St. Rep. 274, were based upon the same propositions. In the case of *Glassell v. Hansen*, 135 Cal. 547, 67 Pac. 964, the court had under consideration the rights of parties to an island which sprang up in the Sacramento river, originally a wide expanse of navigable water, and by its own accretions finally closed one of the channels that separated it from the shore. The patentees of the shore claimed it. In the opinion it was said:

"The accretions were to the island, and not to the lands described in plaintiffs' patent. It is a familiar doctrine of the common law that the owner of land bounded by a river, being exposed to the danger of loss from its floods, is entitled to the increment which, from the same cause, may be gradually annexed to it. . . . It is also elementary that if an island springs up in a navigable stream, it belongs to the sovereign, and not to the owner of the land on either of the banks of the stream. So in this case the principle is the same, whether the island existed at the time of the confirmation of the Mexican grant, or was afterward formed in the river. If the accretions had been to plaintiffs' land, and had gradually extended to the island, the plaintiffs would have been the fortunate ones, and the accretions so added to theirs would have been theirs in law." (Page 550.)

In *King v. Young*, 76 Me. 76, 49 Am. Rep. 596, holding that a mussel-bed over which the water flows at every tide cannot properly be called an island but should be denominated flats, under a colonial ordinance, it was said:

"It seems to be settled both in England and in this country that the land of a riparian proprietor may be increased by accretion. This is not denied by the defendant's counsel. But he contends that the increase must be gradual, and from the shore outward; that if

an island forms at a distance from the shore, and then, by its own growth, extends inward till it reaches the shore, such new-made land will not become the property of the owner of the shore; and in this we think he is correct. He then contends that a mussel-bed is an island, if it first commences to form at a distance from the shore, and there first shows itself above the surface of the water at ebb-tide, leaving sufficient water between it and the shore for boats to pass, although by its continued growth it subsequently extends to and connects with the shore, so as to leave no water between it and the shore at ebb-tide. In this we think he is wrong. We think a mussel-bed over which the water flows at every tide cannot properly be called an island. We think such formations constitute what are called flats; and, by virtue of the ordinance of 1641-'47 belong to the owner of the adjoining land, if within a hundred rods of high-water mark and so connected with the shore that no water flows between them and the shore when the tide is out." (Page 79.)

The principle under consideration holds in the case of reliction.

"The formation by accretion or reliction must be imperceptible, and must be made to the contiguous land so as to change the position of the water's margin or edge." (*Cooley v. Golden*, 117 Mo. 33, 23 S. W. 100, 21 L. R. A. 300, syllabus.)

(See, also, *Cox v. Arnold*, 129 Mo. 337, 341, 31 S. W. 592, 50 Am. St. Rep. 450.)

If the space between the mainland and an island be reduced to a slough, which fills up in such a manner that the two bodies of land join, the respective owners will be entitled to the accretions to their shores. If the slough fills up from the bottom, and the accretions do not begin at the sides, the boundary is the center of the slough, as it was before the water left it. (*Buse v. Russell*, 86 Mo. 209; *Minton v. Steele*, 125 Mo. 181, 28 S. W. 746.) If an island be separated from the mainland by the channel of a river which becomes dry the same rule obtains.

"It will be noted that refused instructions 4 and 5 announce the proposition that if the land in contro-

versy was originally formed in the Missouri river as an island or sand-bar with a channel between it and the mainland belonging to plaintiff, and that by accretions to said bar or island on the south side it finally extended to plaintiff's land on the south bank, or if by the recession of the river from this intervening channel after the formation of the bar or island the bar and the mainland became connected, then plaintiff became the owner thereof as an accretion. This instruction was clearly erroneous in that it ignores the fundamental idea upon which the title to accretions is based, namely, that they must be the imperceptible or gradual accretions to the plaintiff's lands, or the gradual receding of the river therefrom. If the accretions were to the island on the south side, and to the mainland on its north side, and by a change of the river they were thus brought together, such a union of the two tracts did not make the island an accretion to the mainland." (*Hahn v. Dawson,* 134 Mo. 581, 36 S. W. 233.)

"Suppose the channel of the river between an island and the mainland is left dry by the water, and entirely filled up with deposits of mud, and the island and mainland are at last one continuous tract of land, could the owner of either claim the entire tract? Certainly the newly formed land would belong to the United States, or it would be divided between the opposite owners, upon the common-law principle, applicable to nonnavigable streams, of each going to the thread of the channel, as it was before it was deserted by the water. In the event supposed, the river might be regarded as ceasing to be a navigable one, *pro hac vice,* or rather as being converted, at the slough between the island and the shore, into a non-navigable one. In any event the owner of the shore could not claim both the alluvion and the island, nor, *vice versa,* could the owner of the island claim the tract on the bank, with its accessions by alluvion." (*Benson v. Morrow,* 61 Mo. 345.)

If the plaintiffs' land had not been devastated by a violent and convulsive process whose operation was manifest to all who desired to gaze upon it, and its original banks had been worn away by ordinary erosion to the Joy deed line, the defendants could acquire title to it only in the manner described in *Peuker v. Canter,* 62 Kan. 363, 63 Pac. 617; that is, by the outward ex-

Fowler v. Wood.

pansion of their shore-line across it. These principles hold whether the channel separating the plaintiffs' land from that of the defendants' filled on account of the water-works dike or from some other cause.

The defendants argue that the so-called island was a mere sand-bar; that an island, to be worthy of the name, must have become elevated above the bed of the stream far enough to make it fit for agricultural purposes; and that the riparian right of accretion can attach to nothing less dignified. It is not necessary to give a formation on the bed of a river a specific name in order that proprietary rights may attach to it. In many states lands totally or partially submerged are made the subject of grant by the sovereign, in order that they may be reclaimed for useful purposes. Islands that arise from the beds of streams usually first present themselves as bars. (*Cooley v. Golden,* 117 Mo. 33, 23 S. W. 100, 21 L. R. A. 300; *Cox v. Arnold,* 129 Mo. 337, 31 S. W. 592, 50 Am. St. Rep. 450; *Perkins v. Adams,* 132 Mo. 131, 33 S. W. 778; *Hahn v. Dawson,* 134 Mo. 581, 36 S. W. 233; *Moore v. Farmer,* 156 Mo. 33, 56 S. W. 493, 79 Am. St. Rep. 504; *Glassell v. Hansen,* 135 Cal. 547, 67 Pac. 964; *Holman v. Hodges,* 112 Iowa, 714, 84 N. W. 950, 58 L. R. A. 673, 84 Am. St. Rep. 367.)

Before it will support vegetation of any kind a bar may become valuable for fishing, for hunting, as a shooting park, for the harvest of ice, for pumping sand, and for many other well-recognized objects of human interest and industry. If further deposits of alluvion upon its borders would make it more valuable, no reason is apparent why the law of accretion should not apply. It is not before the court to say what primitive formation will carry the right to accretions, but the ability to support crops certainly is not the single test. In any event the rights of the parties to this litigation are to be determined as of the time the formation in the river and that against the shore came

together.. Before then the defendants could not claim title. At that time there is no doubt such formations, whether sand-bar, island, restored land, or something else, were as properly the subject of dominion by the plaintiffs as by the defendants who seized them.

The supreme court of the state of Missouri, within whose jurisdiction the lower course of this river lies, has been called upon to deal with almost every phase of this subject. Its opinions are in full accord with the principles of law elsewhere recognized. Three brief quotations are quite pertinent: ·

"If the island was washed away, in whole or in part, after it was surveyed and then reformed on the same bed, the owner of it, as it was before it was so washed, would be entitled to it, but if it was washed away and the land sought to be recovered was made by deposits to and against the survey of the mainland, then such deposits became the property of the owner of the survey." (*Buse v. Russell,* 86 Mo. 209, syllabus.)

"The sole issue made by the pleadings is whether the lands sued for were accretions to plaintiff's shore-land. If they were and are, he is entitled to them without reference to whether they now extend beyond what was once the center line of the main channel. If they were not formed to his land on the bank of the river by gradual accretion of land thereto or by a gradual reliction of the adjoining bed of the river by the receding of the waters, then he is not entitled to recover, whether the lands be called an island or a sand-bar or by any other designation." (*Perkins v. Adams,* 132 Mo..131, 140, 33 S. W. 778.)

"In view of all this evidence it is plain that whether island 45 remained substantially as originally surveyed, or whether it was washed away and afterward reformed on its original site, it is too plain for discussion that what is termed *'the island'* now is not an accretion to section 21 or section 16. The doctrine of accretion will scarcely admit of *jumping a slough forty to sixty yards wide.* In a word, there is nothing saltatory about accretion." (*Crandall v. Smith,* 134 Mo. 633, 640, 36 S. W. 612.)

Of course the plaintiffs were obliged to recover upon

the strength of their own title.  This they did by connecting themselves with the allottees of the Armstrong grant under the partition proceedings of 1867. The views of the law herein expressed were substantially given to the jury by well-drawn instructions. The period of time within which an owner may reclaim land after it has been submerged is not a question for determination in this action.  The plaintiffs show a title good against the defendants.  The state has not intervened, and whether it has any rights is immaterial to the present decision.  If it really holds the paramount title the defendants cannot take advantage of the fact.  (*McBride v. Steinweden,* 72 Kan. 508, 83 Pac. 822.)

One hundred and ninety-eight special questions were answered by the jury.  The court has considered them all, and finds them to be harmonizable with each other and with the general verdict.  Many pitfalls were prepared for the jury by using the terms "washing away" and "washed away," but they made themselves entirely clear with reference to the precise effect of the action of the water upon the plaintiffs' land.  The argument that there was not sufficient land remaining when the partition suit was commenced from which an island could be cut off and leave 208 acres was doubtless submitted to the jury, the proper tribunal to determine the fact.

Eighty-eight instructions were given to the jury, and numbers of requests for instructions were refused. The instructions given and those refused have been examined, and no error prejudicial to the defendants is discovered.  In view of the findings of fact several matters argued relating to instructions become immaterial.  Defenses were fairly submitted.  The jury evidently gave the water company full benefit of its special defense that the accretion in front of its lot abutted upon the Kansas and not upon the Missouri River bank.  Unwarranted assumptions of fact were

not made in the instructions. It was the duty of the court, and not of the jury, to interpret the partition proceedings.

The petition names a large number of persons as plaintiffs, and describes them as cotenants of the tract sued for. The verdict was in favor of all these parties. The petition further names a number of persons as defendants who are described as cotenants with the plaintiffs. The verdict was also in favor of "those defendants who are tenants in common with the plaintiffs," evidently meaning those named in the petition. The right to the possession of the land described was a matter of common interest to many persons. One tenant in common may recover the entire estate from a trespasser for the benefit of all. Any fractional interest in land is sufficient upon which to base a judgment of ouster against a trespasser. This being true, the plaintiffs in error suffered no material injury because the jury did not catalogue the names of the prevailing defendants and specify the precise proportional share of each plaintiff and prevailing defendant. The plaintiffs in error are not at all solicitous because the names of some five or six persons appear to have been written in the judgment whose right to recover may not be supported by the record, but they seek to overturn the entire judgment because the verdict is in the form described. This they cannot do. Some of the plaintiffs below may be injured. The plaintiffs in error cannot be.

Those who were given acre quantities in the original partition suit had no interest in the unpartitioned common lands when their demands for specific measures were satisfied. Therefore they and their successors have no interest in the litigation. The land recovered is sufficiently described in the verdict.

The 170 assignments of error in the briefs have been duly considered, and none of them requires the case to be tried again. The foregoing observations, which

already transcend the proper limits of a written opinion, express the views of the court with reference to those which are of greatest importance.

The judgment of the district court is affirmed.

All the Justices concurring.