ANNIE B. WOOD, *Appellee*, v. J. S. McALPINE *et al.*
(THE ARMOUR PACKING COMPANY, *Appellant*).

No. 17,009.

SYLLABUS BY THE COURT.

1. JURY—*Challenge to Array—Refused—Not Error.* Under the
law relating to jurors in counties having a population of
100,000 or over (Gen. Stat. 1909, §§ 4630-4639), requiring
the jury list to be revised each year, it was not error to over-
rule a challenge to the array on the ground that such re-
vision had not been made, it appearing that several hundred
names of competent jurors still remained in the box.

2. RIPARIAN RIGHTS—*Accretion—Reliction—Avulsion.* A deed
describing land as beginning at a point on the bank of a
navigable river, running thence along the river bank, pre-
sumptively carries with it the rights of accretion and relic-
tion, but if the land adjoining the bank has been recently lost
by avulsion such deed will not estop the grantor from subse-
quently claiming such land upon its reappearance otherwise
than by natural accretion or reliction. Land added to the
bank by accretion or reliction unaided by artificial means
belongs to the grantee.

3. ———— *"Avulsion" Defined.* To constitute avulsion along the
Missouri river bordering upon Kansas, the bank must be
destroyed or removed suddenly, visibly, rapidly, violently, in
substantial quantity, and in a manner unusual to that river.

4. ———— *Same.* To constitute avulsion it is not essential that
the land torn away be removed intact so as to be capable of
location or identification.

Appeal from Wyandotte district court. Opinion filed
November 11, 1911. Reversed.

*O. L. Miller, A. L. Berger,* and *Frank Hagerman,* for
the appellant.

*W. L. Wood,* and *J. O. Fife,* for the appellee.

The opinion of the court was delivered by

WEST, J.:  Silas Armstrong was the patentee of a
tract of land in the fork of the Kansas and Missouri
rivers containing nearly two hundred and fifty acres.

42—85 KAN.

In 1867 a suit was brought by the various parties who then owned the tract, for partition. A survey was ordered by the court and, later, partition. In September, 1867, the commissioners reported, allotting to Dr. Wood twenty and ninety-four hundredths acres out of the two hundred acres then left of the original tract, the remainder having washed away or disappeared. This report was confirmed. Afterwards, to prevent the Missouri river from further encroaching upon the land, certain portions were deeded to James F. Joy in consideration of his agreement to riprap the bank, which he did, completing the work within a few months. A map showing the allotments and the location of the riprap bank can be found in *Wood v. Fowler*, 73 Kan. 511, 517, 85 Pac. 763. The survey under which the partition was made is known as the Miller survey, the north line of which is from two hundred to three hundred feet beyond the riprap bank. At the time Dr. Wood and others agreed to deed to Joy, the south bank of the Missouri river was working southward, and the agreement was to execute deeds to Joy for certain tracts "bounded on the east by the Missouri river and extending back for quantity as shown upon a plat of said lands," Dr. Wood's portion to be four and one-half acres. This contract was dated August 26, 1868. The deed was dated September 22, 1868, and described the land by metes and bounds "beginning at a point on the bank of the Missouri river . . . thence southeasterly along said river bank to the point of beginning."

This was an action in ejectment by the widow of Dr. Wood to recover from the Armour Packing Company two and eighty-eight hundredths acres of the Wood allotment, numbered 14 (73 Kan. 517), extending northeast from the riprap bank to the Miller survey line. The defendant claims under deeds from Joy's grantees, and under the right of accretion incident to the title under such conveyances.

The plaintiff asserts that early in 1867 a great flood

raised the rivers, the Kansas river first rising and, the ice becoming gorged therein, the water broke through the Armstrong tract, cutting a new channel through which the Missouri river also ran, diminishing the acreage as shown by the commissioners' report already referred to; that the waters, having cut away much of the land, went down late in 1867, but rose again in 1868 and continued the destruction, so that a contract was made with Joy to riprap the bank in order to prevent further encroachment by the Missouri river, a large portion of the Armstrong tract, including the land in controversy, then being submerged by its channel; that after a long lapse of years the defendant and others drove piling out into the river from Kaw Point and thereby finally diverted the channel back to its former location and then the submerged land gradually reappeared; that the submerging of the land in controversy was caused by avulsion and that the deed to Joy conveying the land only to the riprap bank did not convey the northern submerged portion of allotment fourteen, and that the artificial diversion of the channel back to its original location caused the land in question to reappear, and as it has never been alienated by the plaintiff it is still hers.

The defendant contends that the land in question was not cut away by avulsion but by erosion, and that the reappearance was caused by accretion and reliction, which under the terms of the deed to Joy belong to the defendant as his grantee.

After a protracted trial the jury found generally in favor of the plaintiff and the defendant appeals, assigning as error the ruling of the court in denying the challenge to the array of jurors, in permitting the plaintiff to amend her petition, in admitting and rejecting certain evidence, in overruling a demurrer to the evidence, in refusing and giving certain instructions, and in overruling a motion for a new trial.

In every county having a population of one hundred

thousand or over the statute requires the judges of the district court to cause a complete list of the qualified jurors of the county to be made, which list is to be revised each year and as much oftener as the judges shall deem necessary, the names to be placed in the wheel or box from which the panel is to be drawn. (Gen. Stat. 1909, §§ 4630-4639, Laws 1907, ch. 232, §§ 1-4, 6-10, Laws 1908, ch. 61, § 1.) The defendant challenged the array because the requirements of the statute had not been complied with. It appeared, however, that the list had been properly arranged in 1907, though not since revised, and that three hundred and thirty-seven names remained in the box when the panel was to be drawn. The required revision would only result in striking from the list the names of those who had died, removed or otherwise become disqualified, and in adding the names of other qualified jurors. There was no showing that the names still in the box were those of persons in any wise disqualified, and if they were not, their names would have remained had the revision been made. It was practically a question, therefore, of a choice between a few hundred and a few thousand names of qualified jurors, and no substantial rights of the defendant were invaded by overruling the challenge. The cited case of *The State v. Jenkins*, 32 Kan. 477, 4 Pac. 809, involved a long list of names other than the one required by the statute, hence that decision is not controlling.

In the permission to amend the petition, in the rulings on evidence and on the demurrer to the evidence, we find no material error. The instructions given and refused and the denial of the motion for a new trial reached the vitals and fundamentals of the case. Plaintiff's theory of avulsion was supported by numerous witnesses, and while the defendant's theory of erosion was upheld by a still greater number, we can not say that there was not sufficient proof to go to the jury or that the verdict was without evidential basis. The

difficulty consists in ascertaining the true meaning of avulsion and erosion as applicable to the facts of this case.

But before considering these, a subsidiary question should be disposed of. Dr. Wood's deed to Joy beginning at a point on the bank of the river and running thence southeasterly along the river bank was in pursuance of the contract to convey the land bounded on the east by the river and extending back for quantity. The plaintiff's theory is that as Wood owned to the line of the Miller survey and the land between that and the riprap line had been lost by avulsion the title to the bed of that portion had not been lost and the land between the two lines could upon reappearance be claimed by him unless it had actually accreted to the shore line as fixed by the deed. The defendant's contention is that the deed by its own terms shows an intention to convey land bordering upon a navigable stream and as against the grantor is conclusively a conveyance of the rights of accretion and reliction, and that the loss was caused by erosion and not by avulsion, and hence on no theory could the plaintiff claim title to the bed between the two lines. It is conceded that the purpose of the conveyance was to provide for a riprap bank and thereby prevent the further encroachment of the river. Probably as a matter of fact no one thought at that time anything about the land over which the river was then flowing next to the riprap line, and as the construction of the deed is purely one of intention (*Fowler v. Wood,* 73 Kan. 511, 536; 85 Pac. 763; 3 Farnham, Waters and Water Rights, § 855), and as no actual evidence of intention appears, the ordinary presumption following the language used in the deed should control, which is that the title carried the rights of reliction and accretion to the bank as it then existed and which apparently marked the extent of the ownership of the grantor at the time, and the right to adjacent submerged land re-

appearing after loss by erosion. But his ownership of the submerged land at that time depends upon the cause of its submergence. If it was by erosion he did not own it, if by avulsion he had not lost title and therefore did own it. Serious complaint is made concerning instructions upon this point, both as to those refused and those given. The gist of those requested and refused is that the language of the deed conveys to the stream, unless the contrary intention was shown, and that no vacant land was left between the river and the river boundary of the tract, but that all riparian rights incident to the ownership of the shore passed and that the deed, unless contrary intention be shown, carried the right to accretions and estopped the plaintiff from asserting title thereto. The instructions given were to the effect that the deed did not cover the submerged land unless it passed as an inseparable incident of riparian ownership; that the title remained in Wood unless he had lost it by operation of law; that title was either in Wood or in the state, depending upon whether the land had been submerged by avulsion or by erosion.

Aside from the question of avulsion followed by accretion, to be noticed later, the instructions given fairly stated the rule. The repeated use of the term "by operation of law" is criticized and is not to be commended, but the meaning of the phrase was fairly explained in instruction No. 22.

It is argued that the ordinary doctrine of avulsion and accretion is not applicable to the Missouri river on account of the peculiar character of its banks and its habit of eating under and causing portions to drop into the stream, but it is well settled that the general doctrine does apply to the river, though of course it must be used with reference to the peculiar characteristics of the stream. (*Nebraska v. Iowa,* 143 U. S. 359; *Missouri v. Nebraska,* 196 U. S. 23.)

"The argument for the limitation of the avulsion doctrine was made in favor of the abolition of the law

Wood v. McAlpine.

of accretion from the valley of the Missouri river in the cases of *Missouri v. Nebraska* and *Nebraska v. Iowa,* supra. The court held, however, that, notwithstanding the greater rapidity of changes here than elsewhere, the fundamental principles of the law were not affected." (*Fowler v. Wood,* 73 Kan. 511, 523, 85 Pac. 763.)

Avulsion by its derivative meaning indicates a change by tearing or violent wresting. Bouvier defines it as:

"The removal of a considerable quantity of soil from the land of one man, and its deposit upon or annexation to the land of another, suddenly and by the perceptible action of water. In such case the property belongs to the first owner."

Black gives the first paragraph the same and adds:

"The property of the part thus separated continues in the original proprietor, in which respect avulsion differs from alluvion, by which an addition is insensibly made to a property by the gradual washing down of the river, and which addition becomes the property of the owner of the lands to which the addition is made."

29 Cyc. 349 thus defines it:

"Avulsion is the sudden and rapid change of the channel of a stream which is a boundary, whereby it abandons its old and seeks a new bed."

Thus we have two distinct ideas: that of bodily tearing a piece of land away from one owner and adding it to the land of another so that it can be identified, and that of a sudden and violent change in the channel of a river regardless of what becomes of the land washed away. In accordance with the first notion it was said in *Benson v. Morrow et al.,* 61 Mo. 345:

"The term 'avulsion' on the one hand and 'gradual and imperceptible accretion' on the other, are used by writers on alluvion to contradistinguish a sudden disruption of a piece of ground from one man's land to another's, which may be followed and identified, from that increment which slowly or rapidly results from

floods, but which is utterly beyond the power of identification." (p. 352.)

Vattel says:

"For, if I take possession of a piece of land, declaring that I will have for its boundary the river which washes its side, or if it is given to me on that footing— I thus acquired beforehand the right of alluvion; and consequently I alone may appropriate to myself whatever additions the current of the river may insensibly make to my land. I say 'insensibly,' because in the very uncommon case called 'avulsion,' when the violence of the stream separates a considerable part from one piece of land and joins it to another, but in such manner that it can still be identified, the property of the soil so removed naturally continues vested in the former owner." (Vattel, Law of Nations, 6th Am. ed., ch. 22, § 268.)

A half-way rule is found in *Nix v. Dickerson*, 8 Miss. 632, 33 South. 490, holding that where in various years by extraordinary freshets large parts of lands had caved into the river and when the freshet subsided it was evident that an equal deposit had taken place on the other side, the channel remaining the same width but shifted toward the lands where the caving had taken place, the deposit was by an avulsion from the latter lands so that the owner did not lose title. *Stockley v. Cissna*, 119 Tenn. 135, 104 S. W. 792, thus states the doctrine:

"The fact that land is swept away by avulsion does not extinguish the owner's title, for when the land reappears above the water there is a restoration of title and right to possession." (Syl. ¶ 13.)

This would seem to confuse the land washed away with that which reappeared in its place. The idea of avulsion, which has reference mainly to the mere change of shore land, is expressed in *Bouvier v. Stricklet*, 40 Neb. 792, 59 N. W. 550, which held that when a stream bounding a tract of land suddenly abandons its channel and makes for itself a new bed, the middle of the old

channel still constitutes the boundary. In *State v. Pulp Co.*, 119 Tenn. 47, 104 S. W. 437, it was said:

"Where the change to the channel of a river is made suddenly and violently and is visible and the effect is certain, it is said to be by avulsion." (Syl. ¶ 18.)

In *St. Louis v. Rutz*, 138 U. S. 226, it was held:

"If the bed of a stream changes imperceptibly by the gradual washing away of the banks, the line of the land bordering upon it changes with it; but if the change is by reason of a freshet and occurs suddenly the line remains as it was originally." (Syl.)

In *Nebraska v. Iowa*, 143 U. S. 359, it was said:

"But when the boundary stream suddenly abandons its old bed and seeks a new course by the process known as avulsion, the boundary remains as it was in the center of the old channel." (Syl.)

But we are now considering the doctrine of avulsion as applied to land washed away and succeeded by the appearance of other land in its place upon the recession of the water. No one claims that the lost soil can be located and identified, and no one is claiming an addition to his land by reason of soil violently driven against it. What we are trying to ascertain is whether the action of the river in changing its channel and washing away the soil between the Miller survey line and riprap bank was what should be denominated avulsion, or the less violent process of erosion. A general statement of the rule governing such a matter is found in *Fowler v. Wood*, 73 Kan. 511, 85 Pac. 763:

"If the change in the position of a navigable river dividing the territory of two states be by gradual and imperceptible encroachment, or insensible recession, so that the process can not be detected while it is going on, the boundary follows the shifting thread of the stream. But if from storm or flood or other known violent natural cause there be a sudden, visible irruption of the water, whereby the lands upon one side are degraded or submerged or a new channel is cut for the stream, the boundary remains stationary at its former location, and the boundaries of riparian owners.

whose lands have been affected remain unchanged."
(p. 521.)

In *Benson v. Morrow et al.,* 61 Mo. 345, it was said:
"When land is torn from the banks of this stream
(Missouri) and plunged into its turbid waters, its com-
ponent parts are never after distinguishable—the sand
and clay and soil, and trees, and roots and logs are
soon utterly undistinguishable from any other similar
substances, and their destination can never be traced,
except that they ultimately go into the gulf of Mexico,
unless previously to reaching the ocean they are de-
posited on either bank or on some island." (p. 352.)

This is in accordance with the theory of the decision
that the land itself which is torn away must be sus-
ceptible of location and identification. In *Nix v. Dick-
erson,* 81 Miss. 632, 33 South. 490, it appeared that in
extraordinary freshets in various years large parts of
the land in question had caved in—at one time ten
acres, at another one hundred yards, and at another
about thirty-five acres, once carrying a warehouse, an-
other time a cotton house; that these freshets would
last from ten days to two weeks; and this was held to be
an avulsion. In *City of Chicago v. Ward,* 169 Ill. 392,
48 N. E. 927, the action of a breakwater and its effect
were thus stated:

"The destruction of the shore line was not gradual
and imperceptible, but was sudden, and plainly dis-
cernible after every storm, and the city made unavail-
ing efforts to protect the shore from this destruction.
. . . Under the authorities, and according to all rea-
sonable deductions from legal principles, we must hold
that the title to these lands submerged by the action of
Lake Michigan was not lost, and that by their subse-
quent reclamation the city has completely reasserted its
title thereto, as such title stood at the time of the dedi-
cation of the respective plats thereof." (pp. 406, 408.)

In *County of St. Clair v. Lovingston,* (23 Wall.) 90
U. S. 46, the test was said to be whether the witnesses
may see from time to time that progress has been
made, though they could not perceive it while the

progress was going on. In *Nebraska v. Iowa,* 143 U. S. 359, the character and habit of the Missouri river were set forth with much cogency, and, among other things, it was said:

"The large volume of water pouring down at the time of these rises, with the rapidity of its current, has great and rapid action upon the loose soil of its banks. Whenever it impinges with direct attack upon the bank at a bend of the stream, and that bank is of the loose sand obtaining in the valley of the Missouri, it is not strange that the abrasion and washing away is rapid and great. Frequently, where above the loose substratum of sand there is a deposit of comparatively solid soil, the washing out of the underlying sand causes an instantaneous fall of quite a length and breadth of the superstratum of soil into the river; so that it may, in one sense of the term, be said that the diminution of the banks is not gradual and imperceptible, but sudden and visible." (p. 368.)

It was further stated that the portions thus dropping into the river are disintegrated and borne on by the flowing water, there being no transfer of the solid body of earth to the opposite shore. But this was said not with reference to land lost by avulsion, but with reference to land gained by accretion, and it was held that, although the land may have been lost in the manner described, as it became dissolved and not carried in bulk to the opposite shore, the formations on the latter were nevertheless in the nature of accretions. And it was expressly said that "the accretion, whatever may be the fact in respect to the diminution, is always gradual and by the imperceptible deposit of floating particles of earth." (p. 369.)

In *St. Louis v. Rutz,* 138 U. S. 226, it was found by the trial court that the washing away of the river bank did not take place slowly and imperceptibly, but that the caving in and washing away was rapid and perceptible in its progress, occurring principally at the spring rises or floods; that during each flood there was usually carried away a strip of land off the bank from

250 to 300 feet in width, which loss of land could be seen and perceived in its progress; that as much as a city block would be cut off and washed away in a day or two; that blocks and masses of earth from ten to fifteen feet in width frequently were cut off and fell into the river and were carried away at one time. This was on the Mississippi river. In the opinion it was said:

"By findings of fact 6 to 9, the sudden and perceptible loss of land on the premises conveyed to the plaintiff, which was visible in its progress, did not deprive Blumenthal, as riparian proprietor, of his fee in the submerged land, nor in any manner change the boundaries of the surveys on the river front as they existed in 1865, when the land commenced to be washed away. . . . It is laid down, however, by all the authorities that, if the bed of the stream changes imperceptibly by the gradual washing away of the banks, the line of the land bordering upon it changes with it; but that, if the change is by reason of a freshet, and occurs suddenly, the line remains as it was originally." (p. 245.)

It is fairly clear that the doctrine to be deduced from the foregoing authorities, as applied to the Missouri river, is that in order to constitute avulsion the change in the channel or bank must be considerable, visible, violent, sudden and unusual, and that a change not properly characterized by these adjectives must be classed as erosion as distinguished from avulsion. The defendant claims that, although the bank fell in, depositing "lumps and chunks" of soil in the stream, this was the usual thing along the river, and that as the soil so deposited was dissolved and not carried bodily to another place, the process can not be called avulsion, and especially so as the fall was caused by the gradual and imperceptible eating under by the water of the substratum of sand, leaving the bank without support. The authorities already referred to appear to consider avulsion apart from the fact that the land after its removal was carried away intact, or dissolved by the water, and to determine the question by the manner of

its separation from the adjacent land. Indeed, the older rule found in some of the cited cases could not be applied to the banks of the Missouri, as it probably never happens that a substantial portion of the bank is carried bodily to another place so as to be susceptible of identification. But we have seen that the avulsion doctrine is and has been applied to this stream, and hence it must be on the basis of sudden and violent wresting, degradation or destruction of the bank, and not on the basis of its subsequent removal intact. The argument is that as the action of the water in eating away the substratum of sand is gradual and imperceptible, its result must bè so considered, and that what is shown by the evidence is at most only erosion, and not avulsion. In appellant's brief it is said:

"If the cutting off by the river of 200 to 300 feet of its shore, in something over a year of continuous action, at high and low water, in the manner described by the witnesses, was avulsion, then there is and can be no such thing as erosion of the banks of the Missouri river, and the decisions we have cited have been based. on wrong processes of reasoning and have reached wrong conclusions, and their authority must be denied."

The contention of the plaintiff is that the sudden and violent change of the channel was followed for months by the action of a current, very swift, pressing against the new bank formed by the change, working a destruction both violent and unusual, even cutting away the riprap in places after it had been put in as a barrier, and that for months portions of the bank several feet wide and from 50 to 100 feet long would fall into the river, making noises like cannon, heard at long distances, observed and discussed by the citizens. One witness testified:

"I can not say how much this was cut out in addition to the 600 feet cut in April, 1867; it was enough, however, to frighten the landowners very much."

Another witness said:

"I noticed the cutting of the bank from the Kaw's mouth down around the land below, as everybody else did; we frequently walked down along the bank to Kansas City; it was great chunks of it falling off into the water; sometimes there would be great big trees slip over into the water with the dirt; it continued more or less all the time, I think, until the time it was rip-rapped."

Instruction No. 7 requested the court to call the attention of the jury to the peculiar and known characteristics of the river, and to advise that if the washing out of the underlying stratum of sand caused an instantaneous fall of quite a length and breadth of soil into the river, even sudden and visible, yet if such portions disintegrated and were carried down the river, this process would be erosion and not avulsion. Had this instruction been requested freed from the doctrine that the portions falling into the river must not have suffered disintegration, it would have been more nearly proper, but its refusal as a whole was not error.

Instruction No. 6 was properly refused because it used the expression "cut and eroded" and " cutting and eroding," thereby assuming the very point in issue.

Serious fault is found with instructions Nos. 17 and 17a for failure to define avulsion as to make it applicable to the Missouri river with its peculiar characteristics, and for failure to call attention sufficiently to the question whether the cutting of the banks in this case was in the usual and ordinary manner incident to the river. No. 17 defined erosion as "the gradual, invisible and imperceptible wearing away of the bank by the natural action of the water in the stream," and avulsion as "when the water impinges upon the bank in a violent, unusual and destructive manner and the bank is torn and visibly removed so rapidly that an ordinary observer could see and know of its destruction by the natural action of the water."

In No. 17a, after calling attention to the peculiarities. of the stream and suggesting that if the changes were more rapid than usual that alone would not characterize them as avulsions if they were gradual and invisible and imperceptible, it was said:

"They would still be erosion, and not avulsion, unless. the cutting was so rapid and great that an observer would see and notice the disappearance of the soil in large quantities and a corresponding diminution or change of the bank by the action of the water. These are necessary to characterize the act as an avulsion.. The words invisible and imperceptible, as used herein, do not mean that one observing the cutting should not be able to see small particles of the bank crumbling and falling into the water, but that he should not be able to see and perceive a marked diminution and destruction of the bank. To constitute avulsion as contemplated by law, it must be plainly noticeable to an ordinary observer that the banks are being rapidly cut and carried away in large quantities, causing a sudden change in the river's edge, and the submerging of land and washing away of its soil and surface in an unusual way."

This is criticised on account of the expressions "small particles" and "a marked diminution and destruction of the bank," the suggestion being that as "lumps and chunks" confessedly fell into the river from time to time the quoted language practically amounted to an instruction that the jury must find avulsion. But these expressions must be considered modified by the closing words of No. 17a—"sudden change in the river's edge, and the submerging of land and washing away of its soil and surface in an unusual way."

It is also complained that the attention of the jury was not directed to the claimed insensible and imperceptible process of eating away the substratum of sand, thereby leaving the surface without support and causing it to fall. As the evidence of many witnesses described this eating under process as one characteristic of the Missouri river, this should have been definitely

mentioned in the instructions, and it was not covered by the reference in No. 17a to the habits of the river, or elsewhere. It is insisted that the court failed to distinguish or define avulsion as applied to the river in question but substantially defined erosion instead. It is of necessity difficult, if not impossible, to fix the dividing line between avulsion and erosion. Suddenness, visibility, rapidity, violence, quantity and unusualness mark the one as their absence marks the other. In view of the conditions shown, however, the jury should have been given to understand that, considering the character of the bank, and the characteristics of the stream, including the testimony as to its habit of "eating under" and its effect, they must, to find avulsion, determine from all the evidence that the destruction was sudden, rapid, visible, violent, of substantial amount, and in a manner unusual along the Missouri river, and these elements were not made sufficiently plain and prominent by the instructions given.

Instruction No. 14 requested, and refused, was that if accretions had formed along the riprap bank at or before the time of the building of the dike near the mouth of the Kansas river, then the owners of the land abutting on such bank had the right so to place a dike as to protect and preserve any accretion so formed. Instead, the jury were instructed, in substance, that the land formed there by accretion or reliction could be protected from the action of flood waters if it could be done without placing obstructions in the bed of the river to impede its flow or velocity and tending to deflect its current; that such an interference would be wrongful. This instruction as given was in accord with the rule stated in *Fowler v. Wood,* 73 Kan. 511, 85 Pac. 763.

Objection was made to instruction No. 17 because, as stated by counsel in a colloquy with the court, it cut

out absolutely the question of accretion.  To this the court responded:

"If one person owns the bed on which it forms and another person owns the bank against which it forms, I mean to declare that what would in other cases be known as accretion to the bank of the riparian owner belongs to the owner of the bed."

Mr. Miller:  "Although it accreted from the bank out?"

The court:  "Yes."

In No. 17 the jury were told that if the land was lost by avulsion the owner's rights to the use of the land so submerged were merely suspended, "and if afterwards, by a change in the course of the river or the channels thereof or in any other way whatever his land is restored, together with any filling thereon, no matter how made, he is the owner and entitled to the possession thereof.  No one can, during such time acquire any right to his submerged land without obtaining a conveyance or demise from him, or by a judicial sale of his interest in the land."

In instruction No. 19 the jury were told that if there was a formation against the bank caused by the natural and uninterrupted action of the water of the river, it would as a general rule be accretion and would be the property of the riparian owner, but that there is one exception to that rule:

"If the accretion is formed on a base or bed of the river, the title to which was not in the state, but was in the plaintiff, as it was if she lost her land by avulsion, then the so-called accretion would belong to the owner of the bed or base upon which it rested and not to the riparian owner."

In No. 22 it was said:

"The defendant, The Armour Packing Company, has succeeded to the rights of James F. Joy, and is entitled to such accretions as have been formed against its river bank, provided that the bed of the river in front

43—85 KAN.

of said land belongs to the state of Kansas, but not if it belongs to the plaintiff."

We do not so understand the law. Evidently counsel for plaintiff does not either, for in the opening statement to the jury he said:

"And it did n't belong to Armours, and it is our theory that if any of it ever belonged to Armours that it must have belonged to them upon this idea, that little by little, by imperceptible amounts and additions to the riprap bank beyond which Armours did actually own by deed, that it covered over this land. If it did that it is their land."

Submerged land can hardly have greater rights than other land, and had that in controversy been dry land bordering on the river it would have been entitled to gain by accretions and subject to loss by erosion, and the defendant's land is equally so. In *Fowler v. Wood,* 73 Kan. 511, 85 Pac. 763, it was held:

"If the owner of a body of land, a part of which has been submerged, convey the upland and retain title to the remainder, the purchaser, upon the reappearance of the submerged portions, can include it within his boundary only by the process of accretion or reliction." (Syl. ¶ 7.)

In speaking of the rights of those who had made their purchases from a desire to secure a location upon the main navigable channel of the river, it was said:

"What then, are the riparian rights of the defendants? Manifestly those of access to the stream, accretions to their shores, and land left by the reliction of the water from such shores." (73 Kan. 539; see, also, *Peuker v. Canter*, 62 Kan. 363, 370, 63 Pac. 617.)

As it was a controverted question whether the riprap line of the defendant's land had moved north by the process of accretion or reliction, and as there was evidence tending to show accretions there, a proper instruction should have been given, and those quoted were erroneous.

An instruction as to positive and negative testimony

was refused with respect to a deposit or accretion along the riprap bank, but the point sought to be covered by the requested instruction was sufficiently treated in instruction No. 9, the rule contended for never having been applied in this state to this kind of a case. Other complaints are made but we do not find that they involve prejudicial error or need discussion.

This is a case very appropriate for special findings, it being impossible with only a general verdict to ascertain the views of the jury on certain contested and material questions.

For error in the instructions, as indicated, the cause is reversed and remanded for a new trial.