No. 49,565

JAMES D. MURRAY, *et al., Appellants,* v. STATE OF KANSAS, *et al., Appellees.*

(596 P.2d 805)

Opinion filed June 9, 1979. ▮▮▮▮▮▮

*John D. Conderman,* of Arthur, Green, Arthur & Conderman, of Manhattan, argued the cause and was on the brief for the appellants.

*Donald Patterson,* of Fisher, Patterson, Sayler & Smith, of Topeka, argued the cause and was on the brief for appellees Albert D. Wood, Frank Miller, Jr., and Winifred Miller; *Janet Chubb,* assistant attorney general, argued the cause, and *Curt T. Schneider,* attorney general, and *Jonathan P. Small,* assistant attorney general, were with her on the brief for appellee State of Kansas.

The opinion of the court was delivered by

MILLER, J.: This is an appeal by the plaintiffs, James D. Murray and Jeanne F. Hoffman, individually and as trustees of certain trusts created in the wills of Edward F. Murray, Sr. and Esther M. Murray, from judgment entered in the Riley District Court quieting title to certain real estate in the defendant, Albert D. Wood, and quieting title to certain other real estate in the defendants, Frank Miller, Jr. and Winifred Miller. The plaintiffs, who will be referred to as the Murrays, are the appellants; defendants Wood and the Millers, together with the State of Kansas, appear as appellees.

Prior to 1951, land owned by the Murrays, land owned by the Millers, and land owned by Wood, were each riparian to the Kansas river, a navigable stream. The river channel changed suddenly, or by avulsion, following the 1951 flood. The State of Kansas, in 1967, sold the abandoned riverbed to the Millers and to Wood, and issued patents to them. The principal issues before us in this appeal are whether the river channel moved by accretion or avulsion during the period from 1857 to 1951; whether the State owned the land it sold in 1967; and whether the sale and conveyance by the State, without notice to the Murrays, was procedurally and constitutionally valid.

## OWNERSHIP OF THE LAND

The land here involved lies in the west half and the northeast

quarter of section 33, township 10 south, range 7 east of the 6th principal meridian in Riley County, Kansas. Murrays owned (for all purposes here involved) the northwest quarter of section 33. Wood and the Millers owned land in the southwest quarter of section 33, and the Millers also owned a tract in the northeast quarter of that section. According to the 1857 government survey, the Kansas river channel traversed the southwest quarter of section 33, starting in approximately the middle of the south line of the southwest quarter and proceeding in a northeasterly direction toward the northeast corner of that quarter section. The river proceeded across the southeast corner of the northwest quarter and then continued into the east half of section 33.

The Millers, Wood, and the Murrays each derived title by mesne conveyances from the patentees designated in United States Patents issued more than a century ago. The Millers were the owners of Lot 5, which originally included all that part of the southwest quarter of section 33, lying east of the Kansas river, and also Lot 3, which included all that part of the northeast quarter of section 33 lying east of the Kansas river. Wood was the owner of Lots 6 and 7, which included all that part of the southwest quarter of section 33 lying west of the Kansas river. The Murrays were the owners of Lot 2, which included all that part of the southeast quarter of the northwest quarter of section 33 lying north and west of the Kansas river. The 1857 survey indicates that Lot 2 then contained 31 acres. Between 1857 and 1951, the river channel moved in a northwesterly direction into the northwest quarter, thus markedly reducing the acreage in Lot 2 lying north and west of the river. Immediately prior to the 1951 flood, Lot 2 had shrunk to approximately 9 acres, plus railroad and highway rights of way and a small triangular acreage north and west of the highway which is not involved here. During the flood, the nine acre tract was further eroded, and the river cut a new channel about one mile to the southeast.

## A CHANGE IN FEDERAL DECISIONAL LAW

The petition was filed and this case was commenced on December 14, 1973. Three days later, on December 17, 1973, the United States Supreme Court handed down its opinion in *Bonelli Cattle Co. v. Arizona*, 414 U.S. 313, 38 L.Ed.2d 526, 94 S.Ct. 517 (1973), holding that ownership of the abandoned riverbed of a navigable stream is governed by federal law. The Colorado river's

course was changed by a federal rechanneling project; the Supreme Court of Arizona had held that the change in the river's course was an avulsive change, and that under Arizona law, title to the abandoned riverbed remained in the State. The United States Supreme Court reversed, holding that title to the abandoned riverbed vested in the riparian landowners under the applicable federal common law.

The case now before us was briefed and tried under the *Bonelli* doctrine. However, before a final judgment was entered, the United States Supreme Court on January 12, 1977, announced its decision in *State Land Board v. Corvallis Sand & Gravel Co.,* 429 U.S. 363, 50 L.Ed.2d 550, 97 S.Ct. 582 (1977), overruling the *Bonelli* decision. *Corvallis* holds that the determination of title to the abandoned bed of a navigable river is a matter determinable under state law, rather than under the federal common law.

At the time the decision in *Corvallis* was announced, the trial court in this case had communicated its findings to counsel, but stated that a journal entry of judgment could not be entered until a survey was made; thus, no journal entry had been filed and judgment had not been entered. Shortly after the *Corvallis* decision was announced, defendants Miller and Wood filed a motion asking the trial court to set aside its conclusions of law (which were based on *Bonelli*); to adopt new conclusions, based on *Corvallis* and the applicable Kansas law; and to settle the form of the journal entry. That motion was sustained, and the final journal entry of judgment was filed September 19, 1977, incorporating the *Corvallis* holding as the law of this case.

## THE TRIAL COURT'S JUDGMENT

The evidence was hotly disputed; there was testimony from the parties; from many witnesses who had observed the land from shortly after the turn of the century until the time of trial; and from expert witnesses: surveyors, a geologist, and a forester. The trial judge made detailed findings and conclusions—41 separate findings of fact and 27 conclusions of law—which we summarize as follows:

### FINDINGS OF FACT

"2. By a patent issued by the United States of America, dated September 1, 1860, plaintiffs' predecessors in title were granted title to [lot 2, section 33, township ten south, range 7 east, in the district of lands formerly subject to sale at Ogden now Junction City, Kansas].

"3.  Lot 2  .  .  .  was bordered at the time of the Government Survey [1857] . . . on the south and east by the Kansas River . . . .

.  .  .  .

"5.  Plaintiffs acquired title to [lot 2, with certain exceptions not here material] as a result of the administration of the estates of Esther Mabel Murray and E. F. Murray, Sr.

.  .  .  .

"7.  Miller, on the 24th day of April, 1957, by Warranty Deed, acquired title to Lot 5 . . . .

"8.  On the 29th day of June, 1956, Miller acquired title to a portion of Lot 3 . . . .

"8a.  At all and any times material to this action any ground that was north of the south line of the northwest quarter of Section 33, Township 10 South, Range 7 East of the 6th Principal Meridian and west of the east line of the northwest quarter of said Section 33, but southeast of the river channel, was not a part of Lot 2 but was at all times an accretion to Lot 5 of said Section 33 and that part of Lot 3 of Section 33 acquired by Miller by Deed in 1956.

"9.  At all times material in this action, the defendants, Miller, and their predecessors in title are and were the owners of Lots 3 and 5 of Section 33.

"10.  On February 28, 1967, the defendants, Miller, by patent from the State of Kansas, hereinafter referred to as "Miller patent" acquired all right, title, and interest of the State of Kansas in and to [the right half of the abandoned Kansas river channel, lying in the west half and the west half of the northeast quarter of section 33, containing approximately 50 acres].

"11.  With respect to all real estate lying South and East of the above-described real estate set out in the Miller Patent that would, apart from any past, present, or abandoned river channel be a part of the Southeast Quarter of the Northwest Quarter of Section 33, Miller has at all times since April 24, 1957, been in continuous, uninterrupted, open, notorious, quiet, peaceable, exclusive, and adverse possession thereof claiming to be an owner of said real estate under color of title in good faith.

.  .  .  .

"13.  With respect to the Miller Patent described above, there is no evidence of non-compliance by the defendants, Miller, or the State of Kansas with the provisions of K.S.A. 72-2142 and 72-2145. In the absence of evidence of non-compliance with such requirements, the court presumes that such requirements for valid execution and delivery were met.

"14.  Albert Wood, father of the defendant, Albert D. Wood, by warranty deed on the 23rd day of February, 1944, acquired title to Lots 6 and 7 of Section Thirty-Three.

"15.  At all times material to this action, Albert Wood, and his predecessors in title, are and were the owners of  .  .  .  Lots 6 and 7.

"16.  On or about February 28, 1967, the defendant, Albert D. Wood, by Patent from the State of Kansas, acquired all right, title, and interest of the State of Kansas in and to [the left or north one-half of the abandoned Kansas river channel in the west half and the west half of the northeast quarter of section 33, containing approximately 50 acres.]

"17. With respect to the execution and delivery of said patent, there is no

evidence of non-compliance by the patentee, Albert D. Wood, or the State of Kansas, with the requirements of K.S.A. 72-2142 and 72-2145. In the absence of evidence to the contrary, the law presumes that the patent is valid and all statutory requirements for valid execution and delivery were met.

. . . .

"19. The State of Kansas, by its Answer and Motion for Summary Judgment, disclaims any right, title or interest in or to any real estate claimed by any of the named parties to this action.

. . . .

"21. At no time since 1857, and prior to the Flood of 1951, has the State Auditor, or any other official of the State of Kansas ever conveyed any part of Lots 5, 6, 7, or 2 of said Section 33 to a patentee as a part of an abandoned bed of a navigable stream.

. . . .

"24. Prior to the execution and delivery of the Miller and Wood patents, the owner of said Lot 2 [then, Esther Mabel Murray] was given no notice of surveying, no notice of the proposed sale, no notice of the sale, no notice of any appraisement, and no notice of the issuance of the patents other than the recording of the same in the office of the Register of Deeds of Riley County, Kansas.

"25. The 1951 Kansas Flood eroded the nine-acre field of that portion of Lot 2 North of the River and South of the Railroad tracks to approximately four (4) acres and the river cut a new channel around one mile to the south of said Lot 2.

. . . .

"27. In 1967 the State of Kansas issued patents on the abandoned Kansas River channel running between Lots 6, 5 and 2 and through the Southwest Quarter of the Northwest Quarter of Section 33, to Albert D. Wood, Frank Miller, Jr., and Winifred Miller.

"28. Esther Mabel Murray, the record title holder of Lot 2 . . . was given no opportunity to purchase whatever interest said State possessed, if any, of said abandoned river channel which bordered a portion of her property on the south and east.

"29. That as a result of the purported sale by the State of Kansas of the abandoned river channel running south and east of Lot 2 . . . the value of said Lot 2 and said Southwest Quarter of the Northwest Quarter of Section 33 to the plaintiffs has depreciated considerably.

"30. With respect to the movement of the channel of the Kansas River from 1857, at the time of the United States Survey, until the 1951 Flood, when the location of the river channel changed by avulsion:

"(a)   All of the evidence when considered . . . that any movement that occurred from 1857 at the time of the United States Survey to the time of the 1903 flood was a process of erosion-accretion rather than avulsion.

"(b)   All of the evidence produced by all parties shows that all movement that occurred from, during, and after the 1903 Flood to the time of the 1951 Flood in the channel of the Kansas River at the location in question was a process of erosion-accretion rather than avulsion.

"31. In 1951, during, after, and as a direct result of the Flood that occurred on the Kansas River, the location of the river channel as it existed before the Flood . . . and as described by the legal descriptions appearing in the Miller

and Wood patents, was suddenly abandoned, and a new river channel was forged at a location [about one mile to the southeast]. The change that occurred in 1951 was a process of avulsion rather than erosion-accretion.

. . . .

"33. At all times material in this action, and at all locations material, the Kansas River, also known as the Kaw River, is and was 'navigable' within the meaning of K.S.A. 72-2128 to 2142 inclusive, and 82 (a)-201 to 205 inclusive, and within the meaning of Federal law.

"34. Upon admission to the Union in 1861, Kansas succeeded the Federal Government to the rights of the bed of the Kansas River as a navigable stream.

. . . .

"38. The area of land lying between the abandoned river channel south and east of Lot 2 of Section 33 and in the Southwest Quarter of the Northwest Quarter of Section 33, Township 10 South, Range 7 East and the present channel of the Kansas River contains heavily wooded areas. The trees in said areas are predominately cottonwood, American elm and Chinese elm. One tree has a measured circumference of 9 feet 7 inches, another 7 feet 8 inches and many others have a circumference of 7 feet or more. Many trees are 50 to 65 feet in height. The Kansas River has not moved through nor occupied this area between the abandoned river channel and the current channel during the entire life span of these large trees. But, at all times from 1857 until 1951, the channel of the Kansas River was located to the north and west of said heavy wooded area, including the area in which the above trees are located.

"39. Various trees in Lot 2, Section 33, Township 10 South, Range 7 East were examined and found to be the following ages: An elm tree approximately 300 yards northwest of the center of Section 33 was found to be 73 years old; a hackberry tree approximately 300 yards northwest of the center of Section 33 was found to be 65 years old; two cottonwoods approximately 300 yards northwest of the center of Section 33 were found to be 69 and 85 years old respectively; a sycamore tree approximately 150 yards northwest of the center of Section 33 was found to be approximately 100 years old. However, at all times from 1857 until 1951 the channel of the Kansas River was located to the north and west of said wooded area.

"40. That, as established by reasonable scientific certainty, the Kansas River could not have moved through the wooded area . . . between 1857 and 1951."

CONCLUSIONS OF LAW

A.  BURDEN OF PROOF

"1.   The law presumes that the State Auditor and all other government officials performed their official duties in a manner required by law at all times.

"2.   At all times subsequent to 1915 the Law of Kansas imposed a statutory duty upon the State Auditor to have surveyed and sell pursuant to any one of three statutory procedures the abandoned bed of any navigable stream other than accreted land in the State of Kansas. The three procedures are K.S.A. 72-2128 to 2141, inclusive; 72-2142, and 82(a)-201 to 205 inclusive.

"3.   Since no State Auditor or any other official conveyed or attempted to convey any patent to any patentee a part of an abandoned bed of the Kansas River at the location in question at any time from the time of the United States survey in

1857 to the 1951 Flood, the law presumes that no such abandonment occurred by avulsion and the State of Kansas owned the land described in the Wood and Miller patents. The plaintiffs have the burden of proving otherwise.

"4. The burden of proving the invalidity of the patents and their ineffectiveness of conveying property described by each of them is upon the plaintiffs. . . .

B. ACCRETED LAND OF MILLER

"5. When there is a gradual and imperceptible accumulation of land on a navigable river bank by way of alluvion or reliction, the riparian owner is the beneficiary of title to the surfaced land.

"6. A riparian proprietor of land bounded by a stream, the banks of which changed by the gradual and imperceptible process of accretion or erosion continues to hold the stream as his boundary; if his land is increased, he is not accountable for the gain and if it is diminished, he has no recourse for the loss.

"7. The doctrine of accretion guarantees the riparian character of land by automatically granting to a riparian owner title to lands which form between the holdings and the river and thus threaten to destroy that valuable feature of his property.

"8. Defendants Miller, as owners of Lot 5, became the owner of all land that accreted to it prior to the 1951 Flood and thus, by accretion, and as owners of Lot 5, acquired ownership of the above-described tract by accretion.

"9. Defendants Miller, and their predecessors in title, for a continuous period of more than fifteen years, occupied the above-described real estate under a good faith claim of title; were in open, exclusive and continuous possession of said real estate, and by operation of K.S.A. 60-503, acquired ownership of said tract by adverse possession.

. . . .

"16. Determination of the initial boundary between riparian fast lands and a riverbed which the state acquired under the equal footing doctrine—whereby new states, upon their admission to the Union, acquire title to the lands underlying navigable waters within their boundaries—is to be made as a matter of federal law rather than state law, but such determination is solely for the purpose of fixing the boundaries of the riverbed acquired by the state at the time of its admission to the Union; thereafter the role of the equal footing doctrine is ended, and the land is subject to the laws of the state.

. . . .

"20. Where the boundaries of a navigable stream change by a process that involves erosion against one bank and the building up or accretion of another bank, ownership of the channel underneath the body of water between the banks at high water remains in the State of Kansas, and the riparian owner on the eroding side loses what ground is eroded, and the riparian owner of the accreted side acquires by accretion that land which accretes to the bank. (*Green v. Ector*, 187 Kan. 240, 356 P.2d 664; *Schaake v. McGrew*, et al, 211 Kan. 842, 508 P.2d 930; *Rieke v. Olander*, 207 Kan. 510, 485 P.2d 1335.)

"21. Where a change in the boundary of a navigable stream is accomplished by means of a sudden and violent eruption of water whereby a new channel is cut and the old one is abandoned, the State of Kansas retains ownership of the abandoned riverbed unless and until it conveys the same to a patentee by means of

a patent by the exercise of those powers granted the auditor (Secretary of State under present law) pursuant to K.S.A. 72-2142, or K.S.A. 82 (a)-201 to 205, et seq. (*State ex rel v. Turner,* 111 Kan. 302, *Pessemier v. Hupe,* 121 Kan. 511; *Pessemier v. Nichols,* 153 Kan. 267.

"22. At the time of execution of the patents in question to the defendants, Miller and Wood, the State of Kansas had power and authority to convey its ownership in the abandoned riverbed of the channel of the Kansas River as it existed prior to the 1951 Flood, which abandonment occurred by a process of avulsion, by selling and conveying said property without notice to riparian owners pursuant to K.S.A. 72-2142 or 82a-201 to 205. Riparian owners were not denied due process for the reason that the State sold only property it owned and riparian owners were denied no property interest.

"23. On February 27, 1967, the State of Kansas owned all portions of the abandoned river channel as the boundaries of that channel existed immediately prior to the 1951 Flood at all locations material to this case  . . . . .

"24. . . . Both defendants Wood and Miller acquired title to the ground described by their respective [State] patents and both are entitled to have their title quieted against all other parties to this action with respect to their respective ownerships of said tracts.

"25. Plaintiffs are entitled to have their title to Lot 2 quieted against all parties to the action except real estate described and conveyed by the Wood Patent, the Miller Patent, and the property acquired by Millers by accretion to Lot 5 and adverse possession.

"26. Millers are entitled to have their title quieted against all named parties to the action with respect to that property described in the Miller Patent and that property described above which accreted to Lot 5 and which was acquired by Millers by adverse possession.

"27. Wood is entitled to have his title quieted against all named parties to the action with respect to that property described in the Wood patent."

Judgment was entered accordingly.

## THE CORVALLIS DECISION

The appellants contend that the trial court erred in refusing to apply the *Bonelli* decision as the law of this case, and that the court erred in applying the *Corvallis* ruling retroactively. They say that since the case was tried while *Bonelli* was controlling, the circumstances dictate that *Bonelli* should have been applied.

Article VI of the Constitution of the United States provides in part that:

"This Constitution, and the Laws of the United States which shall be made in Pursuance thereof  . . .  shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby  . . . ."

In *Trinkle v. Hand,* 184 Kan. 577, 579, 337 P.2d 665, *cert. denied* 361 U.S. 846 (1959), we said:

"[U]nder this constitutional mandate the interpretation placed on the Consti-

tution and laws of the United States by the decisions of the supreme court of the United States is controlling upon state courts and must be followed."

See also *Harris v. Anderson,* 194 Kan. 302, 400 P.2d 25, *cert. denied* 382 U.S. 894 (1965). *Bonelli* decreed that the ownership of the abandoned channel of a navigable river was governed by federal, not state, law. That decision was controlling, and was binding upon the courts of this state under the supremacy clause, until it was overruled by *Corvallis.* The opinion in *Corvallis* spoke from the date on which it was handed down, and at once became the controlling law on the subject. This case had been fully tried but was yet pending. The trial court held a further hearing, at which the parties were free to offer additional evidence; it then applied state law, under *Corvallis,* to the established facts, and decided the case.

This was not a *retroactive* application of *Corvallis,* in the true sense of the word; it did not act upon or effect rights previously secured. The trial court simply applied the law, as construed in *Corvallis,* to the facts in the pending case. Trial courts are bound to apply the law as it exists when final judgment is entered. Appellants sustained no prejudice in the presentation of their case. We hold that the trial judge did not err in applying the *Corvallis* doctrine.

## THE FINDING OF ACCRETION

Plaintiffs contend that the trial court erred in finding that all losses which occurred to Lot 2 by reason of the northwesterly movement of the Kansas river, from 1857 until the 1951 flood, were caused by accretion. They contend that some were perceivable and occurred at or following floodtide, and constituted avulsion; and therefore the State owned only the 1857 riverbed and not the riverbed which it sold and conveyed by patents to Miller and Wood in 1967.

Both parties agree that whether a river changes boundaries by avulsion or accretion is a question of fact, to be determined from the evidence in accordance with well established principles of law. In *Schaake v. McGrew, et al.,* 211 Kan. 842, 844, 508 P.2d 930 (1973), we said:

"Avulsion is the sudden visible and violent movement of the channel due to storm, flood, or other known violent cause. Accretion is the slow and imperceptible deposit of alluvium or silt on one bank and erosion of the other bank which gradually changes the location of the river channel. (*Fowler v. Wood,* 73 Kan. 511,

85 Pac. 763; *Wood v. McAlpine,* 85 Kan. 657, 118 Pac. 1060, aff'd on rehearing 86 Kan. 804, 121 Pac. 916.)

"When a river or other watercourse is the boundary line between land owned by different parties, the boundary moves as the river's location changes by accretion. If, however, the river suddenly changes its course by avulsion the boundary line remains at the old channel and is forever stabilized there. (*Craig v. Leonard,* 117 Kan. 376, 232 Pac. 235; *Fowler v. Wood,* supra; *Wood v. McAlpine,* supra.)

". . . What constitutes avulsion is a question of law, but whether avulsion occurred is a question for the trier of fact and the determination so made, if based on substantial evidence, is binding on appeal. (*State, ex rel., v. Stockman,* 133 Kan. 7, 298 Pac. 649; *Pessemier v. Hupe,* 121 Kan. 511, 247 Pac. 435.)"

In the *Schaake* case, plaintiff had owned 300 acres on the south side of the Kansas river; due to the southeasterly movement of the river, this acreage was reduced to some 10 acres. We noted that the evidence presented a typical "erosion-deposition" situation; we said:

"The river and, hence, the natural boundary between appellants' and appellees' property has moved south and east diagonally through the greater part of two quarter sections of land since 1889, destroying appellants' farm and increasing appellees' farm as it moves. . . . Centrifugal force causes the current in the main channel to constantly scour and erode the south bank causing its collapse. The felled portions gradually wash away. While the south bank is being constantly destroyed, sand bars are extended from the north bank by deposits of alluvium from the slower-moving portion of the stream." (pp. 843-844.)

Many of our cases have clearly stated the law relating to accretion and avulsion, and it would add little to this opinion to set them all forth here. Perhaps one of the most helpful statements comes from the early case of *Wood v. McAlpine,* 85 Kan. 657, 118 Pac. 1060 (1911) where, at the conclusion of a lengthy discussion of the subject, we said:

"It is fairly clear that the doctrine to be deduced from the foregoing authorities . . . is that in order to constitute avulsion the change in the channel or bank must be considerable, visible, violent, sudden and unusual, and that a change not properly characterized by these adjectives must be classed as erosion as distinguished from avulsion." (p. 668.)

In *Wood v. McAlpine,* a central issue was whether the river bank was cut by avulsion or erosion. There was evidence that the river frequently undercut the bank, washing out a strata of sand, and causing huge chunks of bank to fall into the river, making noises like a cannon. Holding that the trial court erred in its instructions, we said:

"It is of necessity difficult, if not impossible, to fix the dividing line between

avulsion and erosion. Suddenness, visibility, rapidity, violence, quantity and unusualness mark the one as their absence marks the other. In view of the conditions shown, however, the jury should have been given to understand that, considering the character of the bank, and the characteristics of the stream, including the testimony as to its habit of 'eating under' and its effect, they must, to find avulsion, determine from all the evidence that the destruction was sudden, rapid, visible, violent, of substantial amount, and in a manner unusual along the Missouri river, and these elements were not made sufficiently plain and prominent by the instructions given." (p. 672.)

It is clear, under the long established law of this state, that the State of Kansas owns the riverbed of navigable rivers within the boundaries of Kansas, and that the Kansas river is a navigable river; that where the course of a river moves slowly by accretion, the state continues to own the riverbed while the riparian owner on one side may lose land which is eroded or washed away, and the riparian owner on the other side may gain land by the process of accretion, or the gradual buildup of land on his or her side of the river. On the other hand, when a navigable river changes course by avulsion, the state must acquire title to the new channel by purchase or condemnation; it retains title to the abandoned channel, which it may sell; and the holdings of the owners of land riparian to the old channel are unaffected by the avulsive change.

The process of erosion-accretion is gradual; while the erosion process may be visible, it is something that occurs naturally, slowly, and regularly; the accretion process is gradual and imperceptible; and a new channel is never *suddenly* formed.

The process of avulsion, on the other hand, is characterized by a sudden or rapid change; a new channel is formed, usually by a violent eruption or major flood; and there is visible evidence thereafter of an abandoned river channel.

It is not the duty or function of this court to weigh conflicting evidence, to pass upon the credibility of witnesses, or to redetermine questions of fact. We are concerned only with evidence which supports the trial court's findings and not with evidence from which contrary findings might have been made. *Landrum v. Taylor,* 217 Kan. 113, 535 P.2d 406 (1975).

Our earlier cases have not discussed the matter of burden of proof, nor have we adopted a presumption as to whether a change in a river's course is presumed to have occurred by accretion or avulsion. Cases in other jurisdictions have held that where there is a dispute as to whether changes in the course of a river resulted

from accretion or avulsion, the presumption is that the changes resulted from accretion, and one who claims that the change was by avulsion has the burden of showing the avulsion. *Pannell v. Earls,* 252 Ark. 385, 483 S.W.2d 440 (1972); *Roe v. Newman,* 162 Mont. 135, 509 P.2d 844 (1973); *Municipal Liquidators, Inc. v. Tench,* 153 So.2d 728 (Fla. App. 1963); *Schulz v. City of Dania,* 156 So.2d 520 (Fla. App. 1963); *Ark. Land & Cattle v. Anderson-Tully,* 248 Ark. 495, 452 S.W.2d 632 (1970); *Woodland v. Woodland,* 147 N.W.2d 590 (N.D. 1966); and see 65 C.J.S., Navigable Waters § 86(c); 93 C.J.S., Waters § 83; and 78 Am. Jur. 2d, Waters § 427. The *Pannell* court said:

"[W]hen land lines are altered by the movement of a stream, the weight of authority, both state and federal, appears to recognize a strong presumption, founded on long experience and observation, that the movement occurs by gradual erosion and accretion rather than avulsion. *United States Gypsum Co. v. Reynolds,* 18 So.2d 448 (1944); *Dartmouth College v. Rose,* 133 N.W.2d 687 (1965); *Kitteridge v. Ritter,* 151 N.W. 1097; *Bone v. May,* 225 N.W. 367." (p. 388.)

This general rule is sound and we adopt it.

The only evidence before the trial court in the case at hand as to the period between the 1857 government survey and the flood of 1903 was the testimony of Dr. Shenkel, a geologist, and Fred Deneke, a forester, and their testimony was primarily based upon the location and age of certain trees which were growing near the center of section 33. The age of the trees, and certain high ground nearby, caused these experts to conclude that the channel of the river was south of the trees, prior to 1903, and that it moved northwesterly by avulsion rather than accretion, since the river could not have moved slowly through that area. The difficulty with the testimony of these experts was that neither had accurately located the center of section 33. Defense witnesses disputed the location of the trees with reference to the center of the section, and indicated that certain of the trees were south of the center of the section; thus the large trees could have been at the south edge or on the south bank of the river channel as it existed in 1857. There was direct testimony, by witnesses who had observed the river from 1903 to the time of the 1951 flood, to the effect that there was no time when a river channel was abandoned during that period; and that although there was "cave-in" on the Murray side, and the river channel became wider, it did not relocate at any time. Upon the record before us we hold that there is substantial competent evidence to support the trial court's

finding that the movement of the river between 1903 and the 1951 flood was by a process of erosion and accretion, and not avulsion. As to the period between 1857 and 1903, in the absence of evidence it is presumed that the river moved by accretion and erosion; whether the evidence of the expert witnesses was sufficient to overcome that presumption was an issue of fact for the trial court. Since the facts upon which the opinions were based were disputed, we cannot reweigh that evidence. Accordingly, the trial court's conclusion must stand.

## THE BURDEN OF PROOF

The trial court placed the burden of proof on plaintiffs; they contend this was error. Plaintiffs claimed that the Kansas river changed its course between 1857 and 1951 by avulsion, rather than by accretion. Under the rule stated above, there is a presumption that changes are by erosion and accretion unless the contrary is shown. The party claiming avulsion has the burden of proof on that issue.

Plaintiffs contend that the patent to Lot 2 predates the state patents under which Wood and Miller claim, and therefore the burden of proof should have been on Miller. The patents, however, covered different land. The federal patent did not purport to cover the riverbed; the state patents covered the abandoned riverbed, and no part of the land lying north of it. The state patents were issued pursuant to K.S.A. 72-2142 (since repealed). Plaintiffs' argument that the land sold by the state is not within the meander lines as shown by the 1857 survey fails in view of the fact that the "meander line" limitation contained in an earlier statute is not contained in K.S.A. 72-2142. Absent some facial invalidity, the patents are presumed valid. We conclude that the trial court did not err in placing the burden of proof on plaintiffs.

## THE NOTICE ISSUE

Plaintiffs claim that under Kansas statutes and the due process clause, they were entitled to notice before the state sold the abandoned riverbed. The statute under which the land was sold, K.S.A. 72-2142, provides in substance that the state auditor shall cause the abandoned riverbed of any navigable stream to be surveyed, and shall sell it for the best price obtainable. The statute contemplates a private sale, not a public auction, and it does not require the giving of public or other notice of survey or

sale. An earlier statute, K.S.A. 72-2130 (since repealed), provides a wholly different method of survey and sale; that statute requires either actual or publication notice upon the occupants of all contiguous lands, before the survey is undertaken. The statutes are alternative. We hold that the statutes did not require notice in the matter before us.

Was the State, as a landowner, required by the 14th Amendment to the United States Constitution to give notice to all adjoining landowners before selling the abandoned riverbed? We think not. The river channel had moved; plaintiffs' land, Lot 2, was contiguous to the abandoned bed, but it was no longer *riparian* to the Kansas river. There were no longer any water rights involved, and no expectation of accretion. Plaintiffs were simply adjoining landowners. They had no property interest in the riverbed and no right to control or to have prior notice of its survey or sale. Plaintiffs' loss of a part of Lot 2 occurred over a long period of years by reason of the erosive action of the Kansas river. There was no taking by the State and no conveyance or cutting off of any right of plaintiffs by the 1967 sale and conveyance. We hold that prior notice of survey or sale was not required by either Kansas statute or the federal Constitution.

### THE ADVERSE POSSESSION ISSUE

The trial court held that the Millers acquired certain land on the south or right-hand bank of the river by adverse possession. The court also held that the Millers acquired the same land as an accretion to their Lots 3 and 5. The latter holding was correct; and in view of that ruling, the adverse possession issue is moot.

### THE SUMMARY JUDGMENT ISSUE

The State of Kansas, joined as a defendant, disclaimed any present interest in the realty at issue and moved for summary judgment. The trial court granted that motion. Following trial, the court quieted title as against the State. In view of the final determination of the litigation we find no error.

The judgment is affirmed.